BELMONT CLOTHES, INC., ET AL. *v.* PLEET ET AL.

[No. 20, September Term, 1962.]

*Decided October 16, 1962.*

The cause was argued before Brune, C. J., and Hender-
son, Hammond, Prescott, Horney, Marbury and Sy-
bert, JJ.

*Donald N. Rothman,* with whom were *Gordon, Feinblatt
& Rothman* on the brief, for appellants.

*Charles M. Cahn, Jr.,* with whom were *Blades & Rosen-
feld* and *S. Leonard Rottman* on the brief, for appellees.

Sybert, J., delivered the opinion of the Court.

In September, 1961, the Mayor and City Council of Balti-
more City instituted a condemnation proceeding in the Su-
perior Court of Baltimore City to acquire the fee simple in-
terest in the property known as 33-35 Hopkins Place for pub-
lic redevelopment purposes. Joined as defendants were Fannie
E. Pleet, who owned the property in fee simple, and Emanuel
Pleet, her husband (appellees here), and Belmont Clothes,
Inc., tenant of the property (appellant here), as well as cer-
tain other parties not affected by this appeal.

The Pleets, in their answer to the City's condemnation peti-
tion, denied that Belmont Clothes, Inc. had any right or in-
terest in any part of the forthcoming condemnation award.
Belmont, in its answer to the petition, claimed that it had a
substantial interest in the property by reason of an existing
lease having five years yet to run, and a right to be compen-
sated for the taking thereof. The City and the Pleets there-
upon entered into a stipulation whereby the latter agreed to

accept the sum of $290,000 as the total fair value of the property being condemned and agreed with the City to pay to the tenant out of that sum the value, if any, of the tenant's interest as determined by condemnation. Since all of the parties agreed that the issue raised by the Pleets involved only a legal interpretation of Paragraph Eighth of the lease between the landlord and tenant, it was further stipulated that the issue of whether or not the tenant has any right to share in the condemnation award was to be determined by a court of law prior to a determination of the condemnation proceedings.

In accordance with this stipulation the matter came before the Superior Court of Baltimore City, which decided that the condemnation of the property would terminate the lease between the parties, by reason of the provisions of Paragraph Eighth thereof, and that Belmont, therefore, is not entitled to participate in the condemnation award. Belmont entered this appeal from the court's order so holding.

Since the City needed to acquire physical possession of the property in order to proceed with demolition in the Charles Center Redevelopment program, the parties entered into a further stipulation which provided for settlement for the property and transfer of title and possession to the City upon certain conditions, one of which was that the sum of $60,000 should be withheld out of the settlement money and placed in escrow pending the decision of this Court. In the event of a decision favorable to Belmont, the $60,000 would continue to be held in escrow until the amount of compensation due it for the taking of its interest should be determined in an appropriate proceeding. Settlement for the property having been accomplished under the stipulation, the City has no interest in this appeal.

Here, as below, the only issue to be determined is the construction of Paragraph Eighth of the lease. Appellees' sole contention is that appellants barred themselves from any right to compensation for the taking of their interest in the land (i.e., the unexpired term of the lease) by reason of that paragraph, which reads:

"Eighth: It is understood and agreed that in the event the said premises are *damaged* by fire, *condemnation by public authorities,* storm, the elements, act of God, unavoidable accident and/or the public enemy, *but not to such an extent as to render the same untenantable, then the Landlord shall restore said premises as speedily as possible* and there shall be no abatement of rent, and if the said premises are *injured or damaged* by any of the aforesaid causes *only to such extent as to render them partially untenantable the Landlord shall restore such premises* so injured or damaged as speedily as possible, rent to abate proportionately on such part of said premises as may have been rendered wholly untenantable until such time as such part shall be fit for occupancy, and after which time the full amount of rent reserved in this Lease shall be payable as hereinbefore set out. And if said premises are *injured or damaged* by any of the aforesaid causes to such an extent as to render the same *wholly untenantable, then this Lease shall thereupon become null and void,* and all liability of the Tenant shall terminate and the rent shall be adjusted as of the date of such happening." (Emphasis supplied.)

The dispute revolves around the construction of the words "condemnation by public authorities" in Paragraph Eighth. The appellees argue that this phrase should, in the context of the entire lease, be read as including condemnation under eminent domain. Appellant, on the other hand, contends that the condemnation contemplated by the parties was intended to be limited in scope to the kind of condemnation resulting from failure to comply with orders of the Health, Fire or Police Departments. If the construction urged by the appellees is proper, then it is rather clear that the demised premises were "injured or damaged", within the contemplation of the clause, by the City's acquisition of the property under the power of eminent domain. Under this aspect, since the premises would be rendered wholly untenantable, the lease would be null and

void as of the date of the taking and the appellant, as tenant, would have no estate or interest in the premises which would give rise to its claiming any part of the award in condemnation for the taking, as damages for the unexpired portion of its lease. However, if "condemnation by public authority" was not intended to include a taking by eminent domain, then appellant, as tenant, would be entitled to compensation for the interest in the land of which it has been deprived by the City's taking. *Gluck v. M. & C.C. of Balto.,* 81 Md. 315, 32 Atl. 515 (1895); *Veirs v. State Roads Comm.,* 217 Md. 545, 143 A. 2d 613 (1958).

The general principle that, if possible, the meaning of a written contract must be ascertained from the language of the instrument itself by giving the words used their usual and ordinary meaning as shown by the context in which such words are employed, and that only where the intention of the parties cannot be gleaned from the words alone will the courts apply the rules of construction in determining the legal significance of a disputed passage, needs no citation of authority.

In the instant case it would appear that the language in Paragraph Eighth was intended to define the rights of the parties where, due to "damage" or "injury" to the property, the problem of restoration of the premises to occupancy should arise. The paragraph first provides that if the physical damage to or deterioration of the property was such that the premises were not rendered untenantable, the landlord must restore them (which she would otherwise not be required to do), but that rent should not abate. It next provides that if the premises were rendered partially untenantable, the landlord must restore them and the rent should abate proportionately. The final provision is that if the premises were so injured or damaged as to render them wholly untenantable, the lease should terminate, which would, of course, relieve the landlord of the obligation to restore the premises to tenantable condition. It thus seems obvious that the parties were dealing in Paragraph Eighth only with the obligation of *restoration* in the event of physical harm to or deterioration of the property, and the interpretation of the disputed phrase must be made in that con-

text. Manifestly, if the premises were *taken* for public use under the power of eminent domain it would be impossible for the landlord to restore them. This demonstrates, we think, that the use of the disputed phrase was not intended to include a "taking for public use." Indeed, it was agreed in the case that the Charles Center project was not even a "gleam" at the time the lease was entered into and therefore in no way influenced its language. It would seem that if the intention of the parties had been to include a provision to cover such a vital occurrence as the taking of the property for public use it would have been clearly stated. See *United States v. Petty Motor Co.,* 327 U. S. 372, 375 (1946); *In re John C. Lodge Highway,* 65 N. W. 2d 820, 822 (Mich. 1954); *In re Widening Third Street,* 228 N. W. 162, 163 (Minn. 1929).

While we have found no Maryland decision in point, the case of *City of Columbus v. Huntington National Bank,* 143 N. E. 2d 874 (Ohio 1956), is closely analogous to the one before us. There the principal question concerned the interpretation of that portion of a written lease which read as follows:

> "It is mutually agreed by and between the lessor and the lessee that if during the term hereof, or any extension thereof, the demised premises or any part thereof be *rendered untenantable by public authority* or by fire or other casualty (except such as shall have resulted from the negligence of the Lessee), a proportionate part of the rent herein reserved, according to the extent of such untenantability, shall be abated and suspended until the premises are again made tenantable and restored to their former condition by the Lessor; and if the premises or a substantial part thereof are thereby rendered untenantable and so remain for a period of ninety (90) days, the Lessee may, at its option, terminate this lease by written notice to the Lessor; and if the premises cannot by reasonable efforts be restored to their former condition within ninety (90) days, either the Lessor or the Lessee shall have the option of terminating this lease by written notice to the other."

(Emphasis supplied.)

In that case the court refused to construe the clause as including a taking by public authority under the power of eminent domain. Stating that the phrase "rendered untenantable by public authority" would have to be interpreted in the light of the entire paragraph, the court pointed out that leases containing provisions with respect to the rights of the parties in the event of condemnation for public use invariably contain phrases explicitly mentioning "public use" or "eminent domain," citing *United States v. Petty Motor Co., supra,* and *In re John C. Lodge Highway, supra.* After noting that in the lease before it there was no mention of the eventuality of a taking by public authority for public use, nor any other provision as to the rights of the parties in such case, the Ohio court concluded that the parties had simply failed to contract at all with reference to their rights in the event of an appropriation of the property under eminent domain. In holding that the tenant was entitled to participate in the award paid by the City of Columbus for the taking, the court found that, in the preparation of the lease, the parties were:

> "* * * interested in those acts of public authority such as destruction by order of the health board or fire marshal. The casualty or catastrophe guarded against by the lease agreement is where the premises present a hazard which must be removed but which may be corrected by the act of the parties. The phrase, 'if * * * the demised premises or any part thereof be rendered untenantable by public authority * * *' does not mean if the demised premises are taken for public use, then the lease terminates. *The words used show that the intention was to restore the premises to occupancy.* A taking for road purposes was never contemplated by the parties. We cannot imply exceptions in the lease not shown by the language which the parties choose to use."
>
> (Emphasis supplied.)

We find no substantial difference between the Ohio case and the one at hand. Although the word "condemnation" was

not used in the lease there under consideration, it seems evident that Paragraph Eighth in the lease before us, like the clause in the Ohio lease, was intended to fix the duty of the landlord to *restore* the tenant to occupancy in the event of a casualty (such as fire, storm, etc.) or deterioration which would render the premises untenantable. Since a complete taking by public authority for public use is inconsistent with restoration for occupancy, the addition of the word "condemnation" in Paragraph Eighth is not sufficient, we feel, to distinguish this clause from the one considered in the Ohio case. Cf. *Siggelkow v. Arnold,* 245 N. W. 629 (Minn. 1932).[1]

The lower court reasoned that the word "condemnation" is not normally used to indicate that the use of premises is prohibited because it presents an unsafe condition to the public. However, we take notice that the word has for many years been so used. The language of the court in *Friedman Bros. v. Nathan,* 198 N. W. 460 (Minn. 1924), is indicative of the accepted usage of the word in the sense indicated. Another ground for the decision below was that the descriptive phrase "public authority" is not ordinarily used in connection with a body which has the power to prohibit the use of premises. However, we think that the term "public authorities" properly includes any agency or department of government which would have the power to prohibit the use of premises in the event of a casualty or deterioration.

The appellee-landlord strongly urges that Paragraph Seventh of the lease sets forth, with clarity and completeness, the duties and responsibilities relating to compliance with orders of the Health, Fire and Police Departments, and that an interpretation of the condemnation provision of Paragraph Eighth which did not include a taking under eminent domain would reduce that paragraph to a mere redundancy. The last sentence of the seventh paragraph reads:

> "Tenant, at its own expense, will further, promptly comply with and do all things required by any notice served upon it or upon the Landlord in relation to

---

1. There is no question of partial taking involved here.

said leased premises or any part thereof, from any of the departments of the City of Baltimore, the State of Maryland, or the United States; provided, however, that any such notice having to do with the roof or with the internal or external structural integrity of the demised premises will be promptly complied with by the Landlord at its own expense and will not be the responsibility of the Tenant, and provided further, that the Tenant shall be under no obligation to comply with any such notice unless such notice shall be promulgated or issued by reason of the conduct by the Tenant of its business in the demised premises."

The position of the landlord might well be sound if the sentence just quoted could be considered alone and out of context. However, scrutiny of the preceding portion of Paragraph Seventh reveals that the paragraph deals with the questions of alterations to and improvements of the premises, and observance of public law, regulations and orders in regard to the conduct of the lessee's business, and for the tenant's compliance with all national, state and city regulations, including the requirements of the fire underwriters and Health Department, and various other rights and obligations of the parties in connection with such structural alterations or improvements.

As we read the lease, there is no redundancy or overlapping between paragraphs seven and eight. The first provides, in effect, that the tenant should not make any structural alterations without first obtaining the written consent of the landlord, and that if by reason of the conduct by the tenant of its business on the premises lawful notice is served upon it or the landlord to make alterations or improvements, the tenant must bear the expense thereof. No language was used from which any inference can be drawn as to an intention of the parties to provide for what their rights would be if the premises were condemned by public authority as dangerous or unsafe for use. On the other hand, Paragraph Eighth was designed to cover such a condemnation and the rights of the parties (e.g., the abatement, *vel non,* of rent; the obligation, *vel non,* of restoration) in connection therewith.

472

In support of our conclusion in this case, it may be added that: "The decisions show that the courts did not look with favor on clauses causing the forfeiture of the lessee's interest on condemnation, and that a lease covenant will be construed not to have that effect if its language and the circumstances possibly permit that construction." 2 *Powell on Real Property*, § 242, p. 286.

We hold that appellant's lease on the premises in question was not terminated by the provisions of the eighth paragraph thereof, and that therefore appellant is entitled to compensation for the taking of its leasehold interest in the property.

> *Order reversed; case remanded for the determination and award of the amount of compensation to which Belmont Clothes, Inc., or its successor in interest, is entitled. Costs to be paid by the appellee, Fannie E. Pleet.*