829 A.2d 626

DIRECTV, INC.

v.

John A. MATTINGLY, Sr.

No. 130, Sept. Term, 2002.

Court of Appeals of Maryland.

July 31, 2003.

James K. Archibald (Marina M. Sabett, Venable, Baetjer and Howard, LLP, Baltimore, Steven E. Bledsoe, Stephen H. McClain, Kimberly Horsley, Kirkland & Ellis, Los Angeles, CA, Patrick J. Attridge, King & Attridge, Rockville, on brief), for petitioner.

John A. Mattingly, Jr. (Baldwin, Briscoe & Mattinly, Chtd., Lexington Park, on brief), for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, J.

This case arises out of a February 1997 subscription contract between DIRECTV, petitioner, a provider of satellite television services, and one of its customers, John A. Mattingly, Sr., respondent. On August 6, 1999, respondent filed suit against petitioner [1] alleging that petitioner improperly charged him an administrative late fee of $2.81. On November 9, 2001, the Circuit Court for St. Mary's County granted petitioner's motion to dismiss [2] respondent's suit without prejudice. Respondent appealed that judgment to the Court of Special Appeals. On November 4, 2002, that court reversed the trial court's dismissal of respondent's suit against petitioner.[3] *Mattingly v. Hughes Electronics Corp.*, 147 Md.App. 624, 810 A.2d 498 (2002). Petitioner then filed a Petition for Writ of Certiorari with this Court, and, on March 12, 2003, we granted the

---

1. Respondent also filed suit against Hughes Electronics Corporation (Hughes), petitioner's parent company. The Court of Special Appeals, however, upheld the circuit court's dismissal of respondent's claims against Hughes, stating, "we see no error in the court's decision to dismiss the claims against Hughes without prejudice, because the facts alleged by [respondent], even if taken as true, failed to state a claim against Hughes." *Mattingly v. Hughes Electronics Corp.*, 147 Md.App. 624, 644, 810 A.2d 498, 510 (2002)(alteration added). No issue as to this dismissal was raised in the Petition to this Court.

2. In the alternative to its Motion to Dismiss, petitioner filed a Petition to Stay Proceedings and Compel Arbitration. The circuit court issued an order which stated, "Upon consideration of the Defendant's Motion to Dismiss or, In the Alternative, Petition to Stay Proceedings and Compel Arbitration, and good cause having been shown.... ORDERED that the Motion is GRANTED, and it is FURTHER ORDERED that this action is dismissed without prejudice."

3. As previously noted, the Court of Special Appeals upheld the trial court's dismissal of respondent's claims against Hughes. The Court of Special Appeals also addressed other issues that have not been presented to this Court. That court declined to address respondent's alternative claim, which argued that petitioner's arbitration clause was unenforceable as it was unconscionable. We likewise need not address whether the arbitration clause was unconscionable.

petition. *DirecTV v. Mattingly*, 373 Md. 406, 818 A.2d 1105 (2003). Petitioner presents two questions for our review:

"1.  Whether the Court of Special Appeals erred by holding, contrary to established Maryland law, that a party may avoid an agreed upon contract modification by showing that the modification provisions of the original contract were not followed?

"2.  Whether Maryland should join other jurisdictions in holding that modifications to Customer Agreements may be consummated by the customer's acceptance of the services in accordance with the terms of the modified agreement?"

We answer in the negative the first of petitioner's questions and hold that petitioner failed to provide sufficient notice of the changes to the provisions of the initial agreement contained in the subsequent 1997 modified document, which changes included an arbitration provision, because, pursuant to the plain language of petitioner's initial customer agreement with respondent, petitioner did not discuss, mention or even highlight any change in the customer agreement. Under the specific facts of the case *sub judice*, petitioner's failure to adequately follow the notice provisions of the initial customer agreement that petitioner alone authored, foreclosed respondent's ability to reasonably make an informed decision regarding his subscription for satellite television services. Given our holding with regard to petitioner's first question, it is unnecessary to address petitioner's second question. Similarly, we do not address any of respondent's alternative arguments. Accordingly, we affirm the judgment of the Court of Special Appeals.

## I.  Facts

Respondent subscribed to petitioner's satellite service in the course of purchasing the necessary satellite television equipment at a Circuit City store in Waldorf, Maryland. On February 20, 1997, respondent made an oral agreement to accept petitioner's satellite television service subject to the terms and conditions of a written customer agreement to be

mailed to him thereafter. As a result of respondent's acceptance of the customer agreement, petitioner immediately activated respondent's satellite service.

The following day, petitioner mailed respondent an invoice for his purchase of the satellite service. Petitioner included the aforementioned initial customer agreement within the envelope containing that invoice. This customer agreement was entitled, "CUSTOMER AGREEMENT effective as of August 28, 1996, until replaced"[4] (hereinafter, the "initial customer agreement"). The first provision of the initial customer agreement, "AGREEMENT TO TERMS AND CONDITIONS," stated:

"Customer promises to pay amounts billed by DIRECTV for programming services and related fees, taxes, and charges. Customer authorizes DIRECTV to make inquiries into Customer's credit worthiness, including receipt and review of credit bureau information. *Customer's receipt of services constitutes Customer's acceptance of and agreement to all terms and conditions of this Agreement.* DIRECTV reserves the right to change these terms and conditions, including the Applicable Fees and Charges. If any changes are made, we will send you a written notice *describing the change* and its effective date. If a change is not acceptable to you, you may cancel your service. If you do not cancel your service, your continued receipt of any service is considered to be your acceptance of that change. In addition, the individual terms and conditions in this Agreement, whether or not modified, shall survive the cancellation of your service." [Italicized emphasis added.]

The initial customer agreement contains twenty-one other numbered provisions. Within the sixth numbered provision, entitled "FEES AND CHARGES," is a sub-provision describing administrative late fees. It states, "If your payment is not received by DIRECTV before your next statement is issued,

---

4. The initial agreement was executed in February of 1997. Apparently the form agreement used had a pre-printed effective date of August 28, 1996.

you may be charged an Administrative Late Fee up to the amount stated in Section 20 below." Section 20 states that an "Administrative Late Fee" is not to exceed $5.00. The initial customer agreement was silent as to arbitration.

On March 18, 1997, within a month of respondent's subscribing to petitioner's satellite service, petitioner mailed another proposed customer agreement (hereinafter, the "1997 modified document") to respondent. On its face it purported to be effective as of March 1, 1997, a date prior to its mailing to respondent. While that document differed from the initial agreement, it was not accompanied by any separate notice of the changes, or by any comparison of the existing agreement and new proposed agreement. While appearing nearly identical to the initial customer agreement, the 1997 modified document differed from its predecessor in that it contained unhighlighted and otherwise undescribed changes, including the addition of a twenty-third provision, entitled "ARBITRATION." The Arbitration provision stated:

"Any controversy, claim, dispute or disagreement arising out of, or relating to, this Agreement or any services provided by DIRECTV which cannot be settled by the parties shall be resolved according to binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect. The decision of the arbitrator shall be final and binding on the parties and any award of the arbitrator may be entered in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator shall not be authorized to award punitive damages with respect to any such controversy, claim or dispute. The cost of any arbitration hereunder, including the cost of the record or transcripts thereof, if any, administrative fees, attorneys' fees and all other fees involved, shall be paid by the party determined by the arbitrator to not be the prevailing party, or otherwise allocated in an equitable manner as determined by the arbitrator."

It is undisputed that no separate description or any explanation of the changes, *i.e.*, the new arbitration provision, was

ever sent to respondent; the terms of the new document merely contained the arbitration provision while the initial agreement did not.[5] Upon receipt of this new modified document, respondent did not cancel his service [6] with petitioner and thus continued to receive petitioner's satellite services.[7]

---

**5.** Petitioner sent monthly invoices to its customers outlining the specific charges and programming for the customers' subscriptions. On the back of these invoices, petitioner included provisions enumerating its policy regarding "Terms and Conditions," "Application of Payments," "Administrative Late Fee," policy for "Returned Checks" and procedures for inquiring about "Errors or Questions About Your Statement," "Changing or Reactivating Services" and sending in payments to DIRECTV. The invoice provisions did not include any information describing, nor did they even mention, arbitration.

**6.** Similar to the initial customer agreement, the 1997 modified document called for customers to cancel their service if they did not agree with any unilateral change made by petitioner. The "AGREEMENT TO TERMS AND CONDITIONS" section of the 1997 modified document, with italics denoting the changes from respondent's initial customer agreement, states:

"Customer promises to pay amounts billed by DIRECTV for programming services and related fees, taxes, and charges. Customer authorizes DIRECTV to make inquiries into Customer's credit worthiness, including receipt and review of credit bureau information. *Customer's receipt of services constitutes Customer's acceptance of and agreement to all terms and conditions of this Agreement.* DIRECTV reserves the right to change these terms and conditions, including the Applicable Fees and Charges. If any changes are made, we will send you a written notice describing the change and its effective date to *your last known address.* If a change is not acceptable to you, you may cancel your service; *provided, however, that if you do cancel service you will not be entitled to a refund of any prepaid subscription amounts paid in connection with a DIRECTV offer or promotion.* If you do not cancel your service, your continued receipt of any service is considered to be your acceptance of that change. In addition, the individual terms and conditions in this Agreement, whether or not modified, shall survive the cancellation of your service." [Some emphasis added.]

The specific changes of this particular section are not at issue here.

**7.** The facts indicate that several other alleged customer agreements were sent to respondent from 1997 through 1999, each mailed after its purported effective date. All of these documents contained an arbitration provision. The last document, dated October 1999, was in a substantially different format. In fact, the October 1999 document provided binding arbitration (including the warning that "ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JURY TRIAL")

In an invoice dated July 17, 1999, respondent was assessed a late fee by petitioner for a total of $2.81 for a "Past Due" amount of $56.12. Respondent paid this late fee and the accompanying outstanding balance. Then, on August 6, 1999, he filed a class action complaint against petitioner [8] for the purpose of challenging the legality of petitioner's late fee. Respondent's complaint was comprised of four counts.[9] The complaint alleged, in part, that petitioner "knew or should have known that the due date for the payment of satellite television services was unreasonably and unconscionably short and bore no relation to the standard billing cycles of other similarly situated businesses" and that late fees were "exces-

---

after any informal resolution to the dispute failed. It is undisputed that respondent did not cancel his service after receiving these various modified documents and further that no description or highlighting of any change, other than the mere inclusion of the actual language of the changes themselves, was ever provided to respondent.

8. As previously mentioned, this suit included petitioner's parent company, Hughes. Hughes was dismissed from the case by the trial court and that dismissal was affirmed by the Court of Special Appeals. That issue is not before this Court.

9. The first count, "Consumer Protection Law Violation," alleged violations of Maryland's Consumer Protection Act, Maryland Code (1975, 2000 Repl.Vol., 2001 Cum.Supp.), § 13–101 *et seq.* of the Commercial Law Article; the second count, "Unlawful Liquidated Damages," alleged violations of Article III, § 57 of the Maryland Constitution, which sets the legal rate of interest at six percent; the third count, "Liquidated Damages Impermissible by Statute," alleges violations of Maryland Code (1975, 2000 Repl.Vol., 2001 Cum.Supp.), § 2–718 of the Commercial Law Article, and proffers that petitioner's late fees do not qualify as liquidated damages; and the fourth count, "Breach of Implied Covenant of Good Faith and Fair Dealing," alleged a breach of the titled covenants. Count II is a claim that originally was negated by the General Assembly's passage of legislation authorizing a retroactive regulation of late fees in consumer contracts; the legislation was in response to this Court's decision in *United Cable Television of Baltimore Ltd. Partn. v. Burch,* 354 Md. 658, 732 A.2d 887 (1999). There is no dispute between the parties that this count was revived for claims arising prior to the June 1, 2000 by this Court's recent decision in *Dua v. Comcast Cable of Maryland, Inc.,* 370 Md. 604, 805 A.2d 1061 (2002). *Dua* held that the statute's retroactivity provision was in violation of both the Maryland Declaration of Rights and the Maryland Constitution. *Dua,* 370 Md. at 610–11, 805 A.2d at 1065.

sive and bore no relationship to the administrative charges incurred in processing late payments." Respondent amended his complaint on September 7, 1999.[10]

Petitioner and Hughes sought to remove the case to the U.S. District Court for the District of Maryland, but that court remanded the case because the lawsuit did not satisfy the subject matter jurisdiction requirement that in diversity claims in federal court the amount in controversy must exceed $75,000. *See* 28 U.S.C. § 1332(a) (2003)(stating, "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,-000, exclusive of interest and costs, and is between . . . (1) Citizens of different States; . . . ."). The case was then returned to the Circuit Court for St. Mary's County. Petitioner and Hughes immediately moved for dismissal of respondent's complaint, alleging that his specific claims should be dismissed, or, in the alternative, that the circuit court proceedings must be stayed and arbitration compelled. The Circuit Court, after a hearing, found that respondent was required to arbitrate his claims against petitioner pursuant to the 1997 modified document and subsequent customer documents. That court then granted petitioner's motion to dismiss without prejudice and respondent appealed to the Court of Special Appeals. As previously mentioned, the Court of Special Appeals reversed the trial court's dismissal of respondent's complaint against petitioner and petitioner appealed to this Court.

## II. Discussion

■ The determinative issue on review in this case is whether petitioner, under the plain language of the initial customer agreement, satisfactorily notified respondent of unilateral changes made to the initial customer agreement, with particular reference to the addition of a mandatory arbitration

---

**10.** No substantive amendments relating to the four ·previously mentioned counts within the Complaint were made. The amendments were comprised of the addition of three averments to the section of the Complaint entitled "PARTIES AND JURISDICTION."

provision. Specifically, did petitioner comply with its own contractual language mandating that "[i]f any changes are made, [petitioner] will send [respondent] a *written notice describing the change* and its effective date." (alterations added)(emphasis added). We hold that petitioner failed to abide by this provision of the initial customer agreement which it authored, thus rendering the subsequent changes contained within the 1997 modified document and subsequent documents, including adding the arbitration clause, invalid. As respondent did not have adequate notice of the arbitration clause and therefore could not have voluntarily assented to arbitration, we hold that the Court of Special Appeals was correct in finding that compelled arbitration was not required under the contract. While the arbitration clause and its applicability to the instant dispute provides the shell of the case *sub judice*, arbitration is merely a context for the threshold issue—the interpretation of a provision within a contract that did not contain an arbitration clause—the initial customer agreement. Our decision, therefore, rests solely upon this Court's interpretation of Maryland contract law and not on principles set forth within the substantive law of arbitration.[11]

---

11. In fact, respondent questions the very notion that the customer agreements between him and petitioner are even binding contracts. He argues that the monthly statements (*i.e.,* the monthly bill or invoice) he receives from petitioner actually function as the binding contract between the two, because the invoices include, not only the programming to be received, the cost of the programming, identification of the two parties, the procedures for payment and the duration of the agreement, but they also "state[ ] with particularity the 'Terms and Conditions' " of the agreement (alteration added). The Terms and Conditions on the back of each monthly statement include petitioner's policy regarding "Terms and Conditions," "Application of Payments," "Administrative Late Fee," policy for "Returned Checks" and procedures for inquiring about "Errors or Questions About Your Statement," "Changing or Reactivating Services" and sending in payments to DIRECTV. The invoices, however, do not include any arbitration provision. Petitioner argues that these invoices, sans the arbitration provision, express the true terms of the contract between he and petitioner, not the customer agreements. It is not necessary, however, for this Court to address this issue, because we hold that petitioner failed to fulfill its obligation under the terms and conditions included in the initial customer agreement.

## Contract Interpretation

The long-standing principles of this Court's interpretation of contracts were set out in *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 768 A.2d 620 (2001). In *Wells*, we interpreted an arbitration clause within a Cardholder Agreement between a bank and its customer in order to ascertain whether the clause was agreed to by all parties. We said:

"Our analysis begins, and in this case ends, with the words of the written contract.

"The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court. *Auction & Estate Reps., Inc. v. Ashton*, 354 Md. 333, 341, 731 A.2d 441, 445 (1999); . . . *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 170–71, 702 A.2d 767, 773 (1997); *JBG/Twinbrook Metro Ltd. Partnership v. Wheeler*, 346 Md. 601, 625, 697 A.2d 898, 911 (1997); *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 306, 596 A.2d 1069, 1075 (1991). In determining the meaning of contractual language, Maryland courts have long adhered to the principle of the objective interpretation of contracts. *Ashton*, 354 Md. at 340, 731 A.2d at 444; . . . *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298, 304 (1996); *Maryland v. Attman/Glazer P.B. Co.*, 323 Md. 592, 604, 594 A.2d 138, 144 (1991); *Cloverland Farms Dairy, Inc. v. Fry*, 322 Md. 367, 373, 587 A.2d 527, 530 (1991); *Feick v. Thrutchley*, 322 Md. 111, 114, 586 A.2d 3, 4 (1991); *Aetna Cas. & Sur. Co. v. Insurance Comm'r*, 293 Md. 409, 420, 445 A.2d 14, 19 (1982). Under the objective interpretation principle, where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court. *Ashton*, 354 Md. at 340, 731 A.2d at 444; *Wheeler*, 346 Md. at 625, 697 A.2d at 911; *Insurance Comm'r*, 293 Md. at 420, 445 A.2d at 19. 'If a written contract is susceptible of a clear, unambiguous and definite understanding . . . its construction is for the court to determine.' *Rothman v. Silver*, 245 Md. 292, 296, 226 A.2d 308, 310 (1967).

"Further, '[t]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean.' *Ashton,* 354 Md. at 340, 731 A.2d at 444 (citing *Adloo,* 344 Md. at 266, 686 A.2d at 304; *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *Board of Trustees v. Sherman,* 280 Md. 373, 380, 373 A.2d 626, 629 (1977)). *See also Beckenheimer's Inc. v. Alameda Assocs. Ltd. Partnership,* 327 Md. 536, 547, 611 A.2d 105, 110 (1992) ('A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean'). The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed. *Kasten Constr. Co. v. Rod Enters., Inc.,* 268 Md. 318, 329, 301 A.2d 12, 18 (1973); *Liller v. Logsdon,* 261 Md. 367, 370, 275 A.2d 469, 470–71 (1971); *Belmont Clothes, Inc. v. Pleet,* 229 Md. 462, 467, 184 A.2d 731, 734 (1962); *ST Sys. Corp. v. Maryland Nat'l Bank,* 112 Md.App. 20, 34, 684 A.2d 32, 39 (1996)."

*Id.* at 250–51, 768 A.2d at 629–30. The arbitration agreement in *Wells,* similar to the one in this case, was not contained in the initial agreement between the parties; it was subsequently added through an amendment process. The *Wells* Court, however, specifically did not address the issue we are presented with here, as it "assume[d], *arguendo,* that the Cardholder Agreement ha[d] been validly amended." *Id.* at 250, 768 A.2d at 629 (alterations added).[12]

---

**12.** Specifically, the *Wells* Court stated:

"On or about January 16, 1996, Chevy Chase moved its home office to Virginia. With the periodic statements mailed in January and February of 1996 to its cardholders, Chevy Chase included a notice of change of terms of the Cardholder Agreement. The notice of change took the form of a restatement and revision of the Cardholder Agreement, with the new or revised terms italicized and, with respect to a waiver of jury trial provision, both italics and all uppercase print was used. *Solely for purposes of this appeal, and without indicating any opinion on whether the Cardholder Agreement was effectively amended or whether the amendments are substantively valid, we shall*

In the case *sub judice*, while petitioner asserts that the subsequent documents validly amended the initial customer agreement, respondent argues that the notice provision of the initial customer agreement was not followed, thus he never received proper notice of the proposed changes, and that all subsequent attempts to modify the initial agreement failed. The determinative question in the case at bar, therefore, is, as we have said, whether petitioner complied with the notice provisions of its initial customer agreement with respondent, thus giving respondent adequate notice to make an informed acceptance of the new modified documents.

Petitioner asserts that it did comply with the notice provision because it "sent written copies of the revised Customer Agreements to [respondent], thereby giving him notice of their new terms." (alteration added). Petitioner argues that the wording of the new document stating, "This is your copy of the Customer Agreement . . . between DIRECTV and you as a customer of DIRECTV. Please keep this for your records," coupled with the language stating that the new document was "effective as of March 1, 1997, until replaced," and that "Customer's receipt of services constitutes Customer's acceptance of and agreement to all terms and conditions of this Agreement," constitutes adequate notice *"describing the change."* Respondent argues that, while he did receive a copy of the 1997 modified document, he received no notice or any description of any changes from the initial customer agreement. He argues that petitioner did not make clear which, if any, provision was changed or added and that it was thus

---

call the product of the January and February mailings the 'Amended Agreement.' The Amended Agreement provided that it was made in Virginia and was 'subject to and governed by Virginia law and applicable federal law and regulations.' The Amended Agreement further recited that '[t]he parties agree that by engaging in activities with or involving each other, they are participating in transactions involving interstate commerce.'

"Also contained in the Amended Agreement was an alternative dispute resolution section. . . ."

*Wells*, 363 Md. at 236, 768 A.2d at 622 (emphasis added).

impossible for him to knowingly agree to changes because he had not been properly notified of them.

We have said, "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Wells,* 363 Md. at 251, 768 A.2d at 630. *See also Auction & Estate Reps., Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444 (1999). In ascertaining the plain meaning of the notice provision of the initial customer agreement, we look to the actual language of the key terms within the provision. "Notice" is defined as "information or intelligence . . . an intimation; warning . . . a note, placard, or the like conveying information or a warning . . . a notification of the termination, at a specified time, of an agreement." *The Random House Dictionary of the English Language* 986 (Jess Stein ed., unabr. ed., Random House 1983). To "describe" is defined as "to tell or depict in written or spoken words; give an account of . . . to pronounce, as by a designating term, phrase, or the like; label . . . to indicate; to be a sign of; denote." *Id.* at 390. Synonyms of "describe" include "portray, characterize, represent; recount, tell, relate." *Id.* "To describe is to convey an image or impression in words designed to reveal the appearance, nature, attributes, etc., of the thing described." *Id.* Finally, to "change" is "to make the form, nature, content, etc., of (something) different from what it is or from what it would be if left alone." *Id.* at 246.

The words used clearly reveal the plain meaning of the initial customer agreement's notice provision. In its simplest form, the provision denotes that if a change were to be made to the initial customer agreement, petitioner would provide, in writing, "information or a warning" that would "convey an image or impression in words designed to reveal" the "content" of the new modifications to the agreement that was "different from what" the initial customer agreement stated, "or from what it would be if [the initial customer agreement was] left alone." *Id.* at 246, 390. Basically, petitioner agreed to let respondent know when a change occurred and *what that*

*change entailed,* presumably before the change purportedly became effective. It is clear that this provision obligated petitioner to provide respondent with information on the nature of what was actually changed between the two documents. Such a description was not provided in the case *sub judice.*

Petitioner merely presented the new modified document to respondent; it did not include any explanation or description of what was actually changed. In fact, the new 1997 modified document appeared nearly identical to the initial customer agreement. The same format was used, along with identical type and font. In order to be aware of which provisions were altered by the 1997 modified document, if any, respondent would have had to physically compare the initial customer agreement side-by-side with the new document. He would have had to meticulously comb through both documents line by line and compare each word of the initial customer agreement's fine print to the fine print within the newer document.[13] Only then could respondent even know if a change was made and what it was, let alone be cognizant of the probable impact of the alterations.[14] Because petitioner provided to respon-

---

13. In fact, this Court notes that it is very difficult, given the font and style of the agreements, for one person, alone, to efficiently and effectively compare the two documents at issue in this case. Certainly, it would be difficult for the thousands, if not tens of thousands, of petitioner's ordinary customers. One of the only methods of effectively comparing each difference between the initial customer agreement and the document attempting to modify it is to have one person read the initial customer agreement aloud while another person simultaneously compares the spoken version of the initial customer agreement with that of the written version of the latter document. While this and other methods would allow a customer to actually decipher which provisions have been altered or added within the latter document, it is certainly not what is commonly thought of, or even contemplated, when reading a provision promising "a written notice describing the change."

14. If a customer were to have misplaced, discarded or lost their initial customer agreement due to a hurricane, tornado, flood, fire or other inadvertent cause, it would be impossible for them to have *any* notice of the changed or added provisions. We fail to see how petitioner's inclusion of only the new document provides these customers with a reasonable "written notice describing the change."

dent only the new modified document itself and did not identify which provisions were changed or added, it necessarily failed to afford a satisfactory description of the changes. This failure to describe the changes violated petitioner's initial customer agreement with respondent.[15] As respondent was not given proper notice of the changes to his initial customer agreement with petitioner, respondent could not have constructively assented to the arbitration provision, as found by the circuit court, and thus the terms of the initial customer agreement, without an arbitration provision, control.

Petitioner argues that "Maryland law allows parties to modify their agreements in almost any manner they see fit." Petitioner continues to argue that "Once the contract has been modified or replaced by a new contract, a party cannot avoid the terms of the subsequent contract by claiming that the modification provisions of the original contract were not followed." Petitioner cites several Maryland Court of Appeals cases for the proposition that parties are able to waive written provisions of a contract by their conduct. *See Univ. Nat'l Bank v. Wolfe*, 279 Md. 512, 369 A.2d 570 (1977)(holding that parties to a contract may waive the requirements of a written contract by their conduct where, over a period of approximately two years, 40 of about 100 checks drawn on the depositor's account contained only one authorized signature while the written contract required two signatures and the depositor, after receiving monthly statements, made no complaint during that time); *Taylor v. Univ. Nat'l Bank*, 263 Md. 59, 63–64, 282 A.2d 91, 94 (1971)(holding, in a bank's claim against business partners for unpaid notes where the partners contended that a

---

**15.** We again note that petitioner was the author of the customer agreements and voluntarily included the notice provision within them. Petitioner, as the modifying party, was in a better position than its customers to examine the documents and highlight, describe or explain each change or addition. Petitioner also, by the terms of its customer agreements, had the unilateral authority to amend any of the agreements' terms. Petitioner was well aware of the notice provision and its plain meaning (or should have been) and cannot now escape the terms of its own initial contract when those terms no longer conform with petitioner's interests.

dealer agreement obligated the bank to accept papers from the business without recourse to the partners until the agreement was modified in writing, that parties may waive the requirements of a written contract by their conduct, and there was sufficient evidence of the modification, as the initial agreement did not obligate the bank to purchase paper from the individuals; modification in that case occurred after "execution of the loan guarantee agreement and then by the very act of negotiating the notes to the Bank which notes provided for recourse"); *Pumphrey v. Pelton*, 250 Md. 662, 245 A.2d 301 (1968)(holding that an individual ice cream franchisee did not breach a contract with the state franchiser by selling non-Dairy Queen products where the franchiser acquiesced to the sale of non-Dairy Queen products, because the franchiser was aware of non-Dairy Queen products being sold by the franchisee and other franchisees in the area); *Freeman v. Stanbern Constr. Co.*, 205 Md. 71, 78, 106 A.2d 50, 54 (1954)(remanding a case for trial and directing the trial court to allow evidence of an oral modification to a written contract where the trial court erroneously excluded evidence of an oral modification of a contract between a contractor and subcontractor, because "even though a written contract stipulates that it may not be varied except by an agreement in writing, nevertheless the parties, by a subsequent oral agreement, may modify it by *mutual* consent")(emphasis added). None of these cases, however, concern a plain meaning interpretation of the type of notice clause in the case *sub judice, i.e.,* whether a party to a contract complied with the notice provisions of its contract resulting in the other party receiving valid notice of the proposed changes pursuant to the terms of the initial contract. The facts of the preceding cases present situations where the parties' conduct amounted to mutual assent, or the practical equivalent thereof, to an unwritten practice or change after being fully cognizant of that change of circumstances or procedure. As the situation before this Court presents a dissimilar factual record from this body of case law, petitioner's reliance on these cases is misplaced.

Additionally, in the circumstances of the case *sub judice*, unlike the parties in the cases proffered by petitioner, the conduct of the respondent does not indicate an informed acceptance of the new contractual terms. No mention of any specific change was included in the 1997 modified document or subsequent modified documents as mandated by both the initial customer agreement *and* the 1997 modified document. The very nature of notice provisions is to provide the customer with enough information to make an informed decision regarding any amendments and/or new provisions found within the replacement document.

In addition, under petitioner's rationale the notice provision of the initial customer agreement would be effectively nullified. In fact, petitioner included the very same notice provision, "If any changes are made, we will send you a written notice describing the change and its effective date," [16] in its June 1, 1999, July 1, 1997 and March 1, 1997 documents. Customers, therefore, could look to the very first numbered provision in the new 1997 modified document and read the exact same language, promising them "a written notice describing the change," as was included in their initial customer agreement. As further examination of the document would reveal no description, or mention, of any change, customers could argue that they reasonably believed that no material change was included. Petitioner's actions essentially appear to be an attempt to insert new language into its customer agreements without the knowledge and/or comprehension of its customers.

▮ Under these circumstances, *i.e.*, where a party voluntarily included a notice of changes provision in a customer agreement it authored and had unilateral authority to amend, a holding by this Court that respondent impliedly agreed to changes and new terms within an agreement regardless of whether petitioner complied with the notice provision it au-

---

**16.** This provision in the documents subsequent to the initial customer agreement also includes "to your last known address" after the words "effective date."

thored, would be the practical equivalent of writing the notice provision out of the customer agreement. This Court has long declined to unnecessarily read provisions of contracts as meaningless:

> "A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed."

*Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964). *See also Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993); *Dahl v. Brunswick Corp.*, 277 Md. 471, 478–79, 356 A.2d 221, 226 (1976).

Petitioner argues that the initial customer agreement "simply does not require DIRECTV to send *separate* written notice describing a change" and that the Court of Special Appeals should not have required them to do so. Petitioner misreads the opinion of the intermediate appellate court because the Court of Special Appeals did not hold that separate written notice was *required.* The Court of Special Appeals stated:

> "we conclude that DIRECTV agreed that Mattingly would be bound by any changes that it made to the 1996 Agreement only if DIRECTV gave him some sort of written notice advising him about a particular change, and identifying that change clearly enough that he could find and review it in the revised agreement. *Thus, DIRECTV obligated itself to send Mattingly enough information that he could exercise an informed decision as to whether he wished to continue DIRECTV service,* with the understanding that he would be required to arbitrate any claims he might have against DIRECTV. Whether it did so by a separate mailing, or by a separate document sent along with the new agreement and the billing invoice, or otherwise by a separate provision in that invoice or another document, DI-

RECTV had a contractual duty to give Mattingly *some* written warning, (*i.e.*, 'notice') that the new 1997 Agreement included a new arbitration clause significantly limiting his right to litigate in court (*i.e.*, 'describing the change')." *Mattingly*, 147 Md.App. at 636, 810 A.2d at 506 (emphasis added). The intermediate appellate court merely illustrated a few examples of how petitioner may have fulfilled its obligation under its contract with respondent. The court did not make its holding based on petitioner's failure to send *separate written* notice to respondent, but on the fact that petitioner failed to give respondent "*some* written warning," or *any* description, of the changes. *Id.* Sending a separate mailing could be merely one method used to satisfy the requirement.

Petitioner also argues that the Court of Special Appeals' decision "conflicts with numerous federal courts' decisions under the Federal Arbitration Act, which enforce arbitration agreements mailed to customers after they enter into their initial contract." This argument is without merit. First and foremost, our holding does not rest on FAA grounds; it is not limited to the addition of arbitration provisions.[17] We never reach the questions controlled by the FAA because we hold that there was never a valid agreement to arbitrate due to petitioner's failure to give proper notice of the changes that the 1997 modified document made to the initial customer agreement. That initial customer agreement contained no arbitration clause. We have merely interpreted petitioner's initial contract under Maryland principles of contract law and have concluded that the plain meaning of its notice provision required petitioner to provide a description of the changes made in any subsequent modified document; petitioner did not do so, thus no valid contractual modification has occurred.

---

**17.** This is not to say that other changes, *e.g.*, alterations in fees, programming, etc., are necessarily invalid. Notice, *i.e.*, a description of the change, in other contexts, like changes in fees, *may* have been provided on the billing statement/invoice itself or in another manner. There is no question, however, that the arbitration clause in this case was not mentioned in any writings but the actual provisions of the 1997 modified and subsequent documents themselves.

In light of the fact that the controlling issue in this case is not dependant on a subsequent attempt to impose an arbitration clause, all of the federal arbitration cases which petitioner cites are distinguishable on the grounds that they did not involve a question of whether the party authoring the contract complied with the very notice provision it drafted and included in its initial agreement with a customer. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589–90, 111 S.Ct. 1522, 1525, 113 L.Ed.2d 622, 629–30 (1991)(holding that customers paying for tickets for a vacation on a cruise ship through a travel agent who were later sent their tickets by the cruise line, had notice of a forum selection clause written in fine print on the ticket itself, and were bound by it; no change of terms provisions was involved); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149–50 (7th Cir.1997)(holding that a customer purchasing a computer via a telephone order was bound by the arbitration clause within terms and conditions contained in the box the computer was shipped in, because the computer was not returned within the thirty days mandated by the terms and conditions; a change in the terms and conditions of the agreement was not in issue); *Bischoff v. DirecTV, Inc.*, 180 F.Supp.2d 1097, 1103–06 (C.D.Cal.2002)(involving a customer challenging the arbitration clause contained within DIRECTV's October 1999 customer agreement, which was included in that customer's initial agreement with DIRECTV; DIRECTV's compliance with its notice of changes provision was not in issue); *Bank One, N.A. v. Coates*, 125 F.Supp.2d 819, 826–27 (S.D.Miss.2001)(involving a credit card customer who *did not dispute* the fact that Bank One sent him detailed notice of an amended cardholder agreement, which included an arbitration clause; the customer only challenged that he agreed to the amendment and that the agreement was, itself, substantively unfair and unconscionable); *Herrington v. Union Planters Bank, N.A.*, 113 F.Supp.2d 1026, 1030–31 (S.D.Miss.2000)(customers challenged an amended deposit agreement with a bank, including an arbitration provision, on the grounds that the words "revised" and "amended" were not synonymous; it was "undisputed that the plaintiffs were given

notice"); *Marsh v. First USA Bank, N.A.*, 103 F.Supp.2d 909, 916–19 (N.D.Tex.2000)(although customers who initially had no arbitration provision in their cardholder agreements with First USA Bank challenged whether they received notice of the added arbitration agreement, the bank provided affidavits, depositions and testimony establishing that notice was given in several forms, including provisions on the customer's actual billing statement labeled "SUMMARY OF CHANGES" and inserts with notice of the change); *Stiles v. Home Cable Concepts, Inc.*, 994 F.Supp. 1410, 1412–17 (M.D.Ala.1998)(involving a factual situation whereby a customer argued that he did not understand changes to a cardholder agreement, including the addition of an arbitration clause, but where he did not dispute that the financier, AGFC, provided him with notice of the changes to his cardholder agreement; the notice included a toll-free phone number and address to contact AGFC regarding changes to the account and a separate document entitled "IMPORTANT NOTICE OF CHANGE OF TERMS . . .," which set out the changes in the agreement, a summary of the changes, a provision allowing the customer to sever the new provisions if he/she did not agree to them and a self-addressed postage paid envelope to send a rejection of the changes to the company). The factual circumstances of these cases illustrate the material differences between the issues presented therein from the determinative question raised in the case *sub judice.*

## III. Conclusion

Under the plain language of the petitioner-authored initial customer agreement between petitioner and respondent, petitioner was contractually obligated to provide respondent with "written notice describing" any change made in all subsequent proposed customer agreements. In the case *sub judice,* petitioner merely provided respondent with a copy of the new modified document and did not include any highlighting or other special notice or description, or even mention, which provisions were amended or added. Coupling those facts with petitioner's purported unilateral power to amend the customer

agreement and petitioner's voluntary inclusion of the notice provision in the initial and three subsequent documents, we hold that the initial customer agreement was not validly modified to include the arbitration provision contained within the March 1, 1997 and subsequent modified documents. Because there was no valid modification of the initial customer agreement, that initial customer agreement, without an arbitration provision, controls any disputes between the parties in this case. We hold, therefore, that the Court of Special Appeals was correct in not compelling arbitration and in reversing the trial court's dismissal of respondent's claims against petitioner.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

RAKER and HARRELL, JJ. dissenting.

We respectfully dissent. The Circuit Court for St. Mary's County properly dismissed this case on the ground that the parties agreed to arbitrate any disputes related to their contractual relationship, including the amount of the "late fees" incurred by respondent. Respondent is required to arbitrate his claim against petitioner because he agreed to arbitrate and his claim falls within the scope of that agreement. Our fundamental disagreement with the Majority is its conclusion that Mattingly's undisputed conduct in continuing to receive and pay for DIRECTV's services following receipt of each of the replacement Customer Agreements, most of which were received *before* the late fee dispute arose (the instant litigation was initiated on 6 August 1999; Mattingly paid the late fee assessed on 17 July 1999, without protest, but filed his putative class action suit thereafter), was not conduct sufficient to indicate agreement with the inclusion of the arbitration requirement in the replacement Customer Agreements.

Petitioner, DIRECTV, sent written notice to respondent of the changes made to the customer agreement and the effective dates of the changes. The three pre-dispute customer agree-

ments mailed to respondent—effective March 1, 1997, July 1, 1997, and June 1, 1999—all gave explicit notice of the added arbitration agreement provision, as follows:

"**ARBITRATION:**

"Any controversy, claim, dispute or disagreement arising out of, or relating to, this Agreement or any services provided by DIRECTV which cannot be settled by the parties shall be resolved according to binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect."

Simply because petitioner did not specifically "warn" of or describe the changes separately did not render the changes invalid. Nor was petitioner required to send a separate written notice describing changes in the Customer Agreement. Respondent had adequate notice of the changes, including the arbitration provision—all he had to do was to read the document petitioner enclosed with the bill statement. Contrary to respondent's contention, it was hardly "impossible" for him to agree knowingly to the changes.

The Majority anguishes over the imaginary hardships that would be visited upon Mattingly (or other theoretical ordinary consumer) were he held to be obliged to read each replacement Agreement in order to appreciate what the proposed changes might be (Maj. slip op. at 15). Even a gross visual comparison of the respective replacement Agreements, however, should lead the average person to realize immediately that changes were present. To begin with, the Customer Agreements, in all of their iterations in this record, are not policies of insurance (a pejorative reference as used here). They are instead relatively short, comprising a single, $8\frac{1}{2}'' \times 11''$ page with print on both sides arranged in three columns and then folded, accordion-style, so that it resembles a pamphlet with what would then become six "pages." Each numbered provision bears a subject matter title in bold print. The size of the print, except for the larger DIRECTV logo and the title "CUSTOMER AGREEMENT," appears to be of pitch 6 or 7 in size.

The heading of the cover page of the original Agreement clearly states that it is "effective as of August 28, 1996, *until replaced*" (emphasis added). The heading of the cover page of each replacement Agreement indicates a new effective date, also "until replaced." It does not strain reasonable expectations to assume that the average consumer should appreciate that receipt of a Customer Agreement bearing a new effective date, thus *replacing* an earlier Agreement, likely contains some changes. Common sense "dictates that a revised ... agreement contains terms and conditions that are different from its predecessor." *Herrington v. Union Planters Bank, N.A.*, 113 F.Supp.2d 1026, 1031 (S.D.Miss.2000).

The Majority insists that to be aware of changes to the customer agreement, respondent would have had to "meticulously comb through both documents line by line and compare each word of the initial customer agreement's fine print to the fine print of the newer document." The Majority therefore worries that if a customer were to misplace, discard or lose their initial customer agreement "due to a hurricane, tornado, flood, fire or other inadvertent cause, it would be impossible for them to have *any* notice of the changed or added provisions."

As even the Majority must concede, however, the initial 28 August 1996 Agreement, which Mattingly clings to in this litigation, states, in pertinent part, in its short, opening paragraph numbered 1, also on the cover page of the "pamphlet":

1) AGREEMENT TO TERMS AND CONDITIONS:

\* \* \*

*Customer's receipt of services constitutes Customer's acceptance and agreement to all terms and conditions of this Agreement.* DIRECTV reserves the right to change these terms and conditions, including the Applicable Fees and Charges. If any changes are made, we will send you a written notice describing the change and its effective date. If a change is not acceptable to you, you may cancel your service. If you do not cancel your service, your continued

receipt of any service is considered to be your acceptance of that change.

* &ast; *

(emphasis in original).

Because this language does not promise that the "written notice" of changes will take any particular form, it is not unreasonable to expect that a subsequent, replacement Customer Agreement, bearing a different effective date on its cover page, serves, upon receipt, as written notice sufficient to put the average consumer on notice to examine it for changes.[1] Even a cursory examination of any of the replacement Customer Agreements in this record would have revealed to the average person the particular change that is the gravamen of the present case. A reasonable person, on notice of possible changes, but who may not wish to scrutinize comparatively all of the "fine print" unless there was some more manifest indicium of change, might look to see if any additional numbered provisions had been added. The initial 28 August 1996 Agreement contained twenty-two numbered sections, with the *last*, No. 22, entitled "MINIMUM LEVEL OF SERVICE." The *last* numbered provision of each replacement Agreement was No. 23, entitled "ARBITRATION," preceded by No. 22, "MINIMUM LEVEL OF SERVICE." Thus, had Mattingly exercised the simple expedient of ascertaining the total number of provisions in each Agreement, using the 28 August 1996 Agreement as a base, he would have discovered (if he did not) the very provision he now seeks to avoid so that he may maintain a potential class action lawsuit over the allegedly usurious late fee charge of $2.81. By the even simpler expedient of canceling his subscription for satellite tv service following receipt of any of the pre-dispute replacement Agreements,

---

1. Even were we addressing an insurance policy, where the insured's "duty is not necessarily to read the policy but simply to act reasonably under the circumstances" (*Intern. Brotherhood of Teamsters v. Corroon Corp.*, 369 Md. 724, 739, 802 A.2d 1050, 1059 (2002)), the circumstances of this case (a short agreement where the customer is on notice of the likelihood of changes in replacement Agreements bearing later effective dates) suggest to us a reasonable duty on Mattingly's part to read the first and subsequent Agreements.

Mattingly could have vindicated his objection to the unilateral imposition of mandatory arbitration, albeit at the possible loss thereafter of his ability to view "The Sopranos" or "The Shield,"[2] unless and until cable television is extended to his neighborhood.

In a recent case, *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 824 A.2d 87 (2003) (No. 81, September Term, 2002) (filed 12 May 2003), the Court, in the context of a dispute over whether an agreement to arbitrate existed, was confronted with the issue of "the legal effect of an agreement that contemplates judicial resolution of a particular dispute, upon a prior, general arbitration agreement." *Stinebaugh*, at 635, 824 A.2d at 89. Noting that no reported Maryland appellate decision addressed the issue (*Stinebaugh*, at 646, 824 A.2d at 96), the Court discussed an Oklahoma case, *Shawnee Hosp. Auth. v. Dow Constr.*, 812 P.2d 1351 (Okla.1990), that decided that question in an analogous factual context to *Stinebaugh*. Favorably citing to the *Dow* decision, we iterated "the following principles of contract law relied on by the Oklahoma court":

> Before full performance, contractual obligations may be discharged by a subsequent agreement whose effect is to alter, modify, or supersede the terms of the original agreement or to rescind it altogether. A claim under an earlier contract will be governed by a later agreement if the latter operates to supersede to rescind the former. Where not expressly stated, the legal effect of the later contract on the former must be gathered from a four-corners' examination of the contractual instrument in question.

*Stinebaugh*, at 646, 824 A.2d at 96, citing *Dow*, 812 P.2d at 1353–54 (footnotes omitted). The Court then stated that

> [W]e have embraced legal tenets similar to those employed by our sister state regarding arbitration and contract law. Arbitration is "consensual; a creature of contract."

2. Access to satellite (or even cable) television has not yet risen in American society, we hope, to the level of shelter, food, health care, or other fundamental necessity of life.

*Curtis G. Testerman Co.* [*v. Buck*], 340 Md. [569] at 579, 667
A.2d [649] at 654 [(1995)] (quoting Thomas J. Stipanowich,
*Arbitration and the Multiparty Dispute: The Search for
Workable Solutions,* 72 IOWA L.REV. 473, 476 (1987) (cita-
tion omitted)). As such, "[a] party cannot be required to
submit any dispute to arbitration that it has not agreed to
submit," *id.* (quoting *Gold Coast Mall* [*Inc. v. Larmar
Corp.*], 298 Md. [96] at 103, 468 A.2d [91] at 95 [(1983)] ),
and "[t]he intention of the parties controls on whether there
is an agreement to arbitrate." *Crown Oil* [*& Wax Co. v.
Glen Constr. Co.,*], 320 Md. [546] at 558, 578 A.2d [1184] at
1189 [(1990)]. Further, like Oklahoma, we have recognized
that rights and obligations under contracts may be dis-
charged by subsequent agreements. *See, e.g.,* [ ] *Linz v.
Schuck,* 106 Md. 220, 234, 67 A. 286, 290 (1907) (stating that
modification is "an abandonment of the original contract and
the creation of a new contract").

*Stinebaugh,* at 648, 824 A.2d at 97 (footnote omitted; some
internal citations omitted).

Most courts enforce arbitration agreements that were en-
tered into in the manner that the parties entered into the
instant agreement. In *Bank One, N.A. v. Coates,* 125
F.Supp.2d 819 (S.D.Miss.2001), the court enforced an arbitra-
tion agreement added by a credit card company to the custom-
er agreement by mailing an amendment to the card holders
whose complaints previously had not been subject to arbitra-
tion. The court said:

"Given, then, that the original cardholder agreement per-
mitted amendments, the arbitration provision is not ren-
dered unenforceable simply by virtue of the fact that Bank
One undertook to add the arbitration provision via amend-
ment. Consistent with the terms of the original agreement,
Bank One could validly amend its agreement to add an
arbitration clause, just as it could have amended the agree-
ment to add or change any other term on the agreement."

*Id.* at 831.

Respondent essentially argued that the changes were "pro-
cedurally unconscionable" and therefore should not be en-

forceable. The original agreement permitted unilateral amendment by DIRECTV following written notice to its customers. Consistent with the terms of the original agreement, DIRECTV could add an arbitration provision, unless the manner in which it was added is deemed to be unfair. We do not find DIRECTV's chosen method to be unfair. DIRECTV sent respondent notification of the amendment and specifically gave him the option of rejecting the services if he did not agree to the new terms and conditions, including the arbitration provision. In short, the parties agreed to arbitrate.

We are persuaded that the replacement Customer Agreements, received before the dispute arose, were sufficient written notice to Mattingly of DIRECTV's insertion of a mandatory arbitration provision as a proposed modification in the contractual agreement to govern their respective future performance and rights, that it was not onerous to expect Mattingly to have appreciated that that change had been made, and that Mattingly had a reasonable and fair opportunity to cancel the contract if he objected to the arbitration provision. He elected to continue to receive DIRECTV's services, subject to the mandatory arbitration provision, and should not be allowed now to avoid arbitration of the dispute over the late fee.[3] Accordingly, we would reverse the judgment of the Court of Special Appeals and order that court to affirm the judgment of the Circuit Court for St. Mary's County.

---

**3.** DIRECTV, in a 13 September 1999 letter to Mattingly's counsel from its counsel, offered, subject to the arbitrator's decision whether Mattingly's claim was frivolous or brought for harassment purposes, to pay the filing fees of the American Arbitration Association (AAA), the AAA's hearing fees, hearing room rental fees, and the arbitrator's compensation and expenses.