**HAROLD H. HUGGINS REALTY, INC., et al., Plaintiffs**

v.

**FNC, INC., Defendant.**

**Case No. RWT 07cv1203.**

United States District Court, D. Maryland.

Aug. 28, 2008.

Paul G. Gaston, Law Office of Paul G. Gaston, Washington, DC, for Plaintiffs.

Kirk D. Jensen, Matthew P. Previn, Buckley Kolar LLP, Washington, DC, for Defendant.

### MEMORANDUM OPINION

ROGER W. TITUS, District Judge.

Nearly every person in the burgeoning population that regularly uses the internet has encountered one form or another of a website user agreement, or "clickwrap"[1] agreement. Whether it be in the context of a subscription membership to a news service or an online banking and bill payment account, anyone subscribing to an internet-based service is inevitably greeted with a "pop-up" window containing a lengthy set of "terms and conditions of use." Normally, the user is informed that the agreement is accepted by using the service and is often asked to acknowledge such acceptance through clicking a radio button labeled with an affirmative statement such as "I accept." While clicking on "I accept" constitutes the user's acceptance of the website's contract under the terms and conditions contained therein, such clicking may in reality merely reflect a desire by the user to simply make the pop-up window disappear. In this sense, these contracts are not unlike many other consumer purchase contracts in that they may not be read by the party agreeing to them but they are also no less valid.

This is a case about pop-up windows, notification banners, and website user acceptance agreements. And more importantly, it is about revisions to such agreements. Plaintiffs Harold H. Huggins Realty, Inc. ("Huggins Realty"), P.E. Turner & Company, Ltd. ("P.E. Turner"), Residential Appraisal and Consulting, Inc. ("Residential"), and Alfonso V. Torres d/b/a Front Door Appraisals ("Torres"), provide residential real estate appraisal services. They have brought a class action complaint[2] against FNC, Inc.

---

1. In introducing this term to the judicial lexicon in 1999, Judge David O. Carter provided a useful definition:

 A "clickwrap agreement" allows the consumer to manifest its assent to the terms of a contract by "clicking" on an acceptance button on the website. If the consumer does not agree to the contract terms, the website will not accept the consumer's order. Such agreements are common on websites that sell or distribute software programs that the consumer downloads from the website. The term "clickwrap agreement" is borrowed from the idea of "shrinkwrap agreements," which are generally license agreements placed inside the cellophane "shrinkwrap" of computer software boxes that, by their terms, become effective once the "shrinkwrap" is opened. *Stomp, Inc. v. NeatO, LLC*, 61 F.Supp.2d 1074, 1080 n. 11 (C.D.Cal.1999).

2. Plaintiffs have filed both an Original and an Amended Complaint. Other than adding Torres as a Plaintiff and renumbering para-

("FNC"), on behalf of all real estate appraisers who have used FNC's "AppraisalPort" internet-based service.[3] The crux of Plaintiffs' claims is that FNC induced them to convey their business proprietary appraisal information via AppraisalPort to their client mortgage lenders through false representations that such information would be transmitted securely and would not be viewed, intercepted, or stored by anyone—not even AppraisalPort—except the sending appraiser and the receiving client mortgage lender. In contrast to these representations, Plaintiffs allege, FNC has acquired and compiled this proprietary appraisal data into a "National Collateral Database," where it may be accessed by subscribing lenders and other market participants.

The merits of Plaintiffs' claims, however, are not currently before the Court. Instead, FNC has moved to stay these proceedings in favor of arbitration.[4] Specifically, FNC moves the Court, pursuant to sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3–4,[5] to stay all proceed-

---

graphs, it does not appear that Plaintiffs made any other changes to the Original Complaint. In both complaints, Plaintiffs delineated five separate causes of action: (1) False Advertising under the Lanham Act; (2) Intentional Misrepresentation (Fraud); (3) Negligent Misrepresentation; (4) Conversion, Misappropriation, and Breach of Bailment, and (5) Breach of Implied Contract. The Court has not made a determination as to whether the case may proceed as a class action.

3. AppraisalPort, according to the Amended Complaint, provided an interface on its website through which appraisers like Plaintiffs could make themselves available in a centralized database to residential real estate mortgage lenders looking for appraisers in a particular market, allowing them to order appraisals and receive a standardized electronic report. Its Uniform Resource Locator is "www.appraisalport.com."

4. The motion pending before the Court is actually FNC's second motion to stay proceedings in favor of arbitration. Following full briefing on FNC's first such motion, Plaintiffs filed their Amended Complaint, adding Torres as a Plaintiff. On November 13, 2007, the Court denied the first motion to stay as moot and set an accelerated pleading schedule on the second such motion.

5. Section 3 provides:
If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Section 4 provides in relevant part:
A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or

ings in this case pending arbitration of the claims of three of the four Plaintiffs: Huggins Realty, P.E. Turner, and Residential (together, the "Arbitration Plaintiffs"). FNC argues that the Arbitration Plaintiffs are parties to valid and enforceable arbitration agreements contained in the user agreements that they acknowledged either upon joining AppraisalPort or subsequently through an amendment process and that these arbitration agreements cover the claims in this case. FNC recognizes that Plaintiff Torres, by signing a later user agreement without an arbitration clause, has not agreed to arbitrate, but argues that the Court should also stay his proceedings because his claims are identical to those of the Arbitration Plaintiffs and such a stay would promote judicial economy, while avoiding prejudice through inconsistent results.

Plaintiffs respond that the Arbitration Plaintiffs are *not* parties to a valid arbitration agreement because FNC amended their user agreements during their memberships, replacing them with a new agreement that did not include any arbitration clause. FNC recognizes that it "attempted" to so amend the user agreements but argues that its attempt "failed", as discussed in more detail herein. For the reasons stated below, the Court concludes that no valid agreement to arbitrate exists between the Arbitration Plaintiffs, on the one hand, and FNC, on the other. As such, the Court will deny the motion to stay.

## I.

To use AppraisalPort's services, Plaintiffs' appraisers were required to agree to certain terms of service contained in either a "User License Agreement" or "Subscription Agreement," the specific name of the agreement depending on when the user enrolled.[6] In considering the facts of this case, the timing of when individual appraisers registered and executed a user agreement is important because FNC has offered three different versions of AppraisalPort license or subscription agreements to new users at different times during the period relevant to this case. The first two agreements contain binding arbitration clauses, while the third one includes no such provision. To make what would otherwise be an easy question more complicated, moreover, the parties disagree on whether the third agreement, which does not contain an arbitration clause, superseded any prior agreements that some users acknowledged upon their original registration and that purported to bind the parties to arbitration.

issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

6. Depending on the timing of when a particular user enrolled, the registrant was required to either type his or her initials or check a box at the bottom of the enrollment form next to a statement that advised the user that "by entering your initials above [or checking the box to the left], you agree to the following *terms of service* and *fees* for AppraisalPort." (Emphasis in original.) The actual terms of service and fees, however, were not visible unless the subscribing user clicked on the hyperlinks connected to the text for these items. The website was designed, however, so that a subscribing user could not access the account unless the initials were entered or the appropriate box was checked indicating assent to the terms of service and fees. *See* Am. Decl. of Michael B. Mitchell ¶¶ 4 & 9 & Ex. 1 & 5.

Turning to the specific facts, the first User License Agreement was offered to those users registering starting at some point in 2000 until August 14, 2002 ("2000 Agreement"). It appears to be undisputed that, based on the timing of their enrollment, both Carl Schneider, an appraiser employed by Residential, and Pat Turner, of Turner, acknowledged the 2000 Agreement at the time of their initial registration.[7] In Paragraph 11 of the 2000 Agreement, the user agrees that "[a]ny controversy or claim arising out of or relating to this agreement shall be settled by binding arbitration." [8] *See* Am. Mitchell Decl. ¶ 6 & Ex. 2 ¶ 11. The 2000 Agreement also contains the following provision governing modification:

> This User Agreement may be modified at any time. Whenever changes are made, the revised agreement will be posted at this location. New terms will be effective 30 days after the changes are posted. You will be asked to acknowledge your acceptance of the changes the first time you log in after the changes have been made.

*Id.* unnumbered ¶ after ¶ 17.

On August 14, 2002, FNC introduced a new User License Agreement ("2002 Agreement"), which was offered to new subscribers upon enrollment until July 12, 2005. This 2002 Agreement appears to be identical in its overall structure and as to many specific terms to the 2000 Agreement, with the exception of some specific revisions.[9] It contains a binding arbitration clause that is identical in part to the arbitration clause of the 2000 Agreement, at least as it pertains to the scope of claims subject to binding arbitration.[10] The 2002

---

7. According to FNC's records, Schneider registered on or about July 30, 2001, while Turner registered on or about January 8, 2002. *See* Am. Mitchell Decl. ¶¶ 3 & 5.

8. Clause 11 of the 2000 Agreement states in full:

> Any controversy or claim arising out of or relating to this agreement shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Any such controversy or claim shall be arbitrated on an individual basis, and shall not be consolidated in any arbitration with any claim or controversy of any other party. The arbitrary (sic) shall be conducted in Oxford, Mississippi, and judgment on the arbitration award may be entered into any court having jurisdiction thereof. Either you FNC, Inc. or (sic) AppraisalPort may seek any interim or preliminary relief from a court of competent jurisdiction in Oxford, Mississippi, necessary to protect the rights of property of you or AppraisalPort pending the completion of arbitration.
> All costs and legal fees of FNC, Inc. in any way associated with an arbitration or judicial action arising out of or relating to this agreement, whether such action is between FNC, Inc. and yourself or a third party to whom you have supplied information de-

rived from PORT, shall be paid by you regardless of the outcome of any such arbitration or litigation.

Although Plaintiffs argue that this arbitration provision, as well as the provision in the 2002 Agreement, discussed *infra,* are unconscionable because they attempt to make Plaintiffs responsible for FNC's legal fees and costs regardless of the merits of their claims, *see* Plt. Opp. at 22–26, the Court need not reach this issue at this time and declines to do so.

9. FNC's Director of Business Development explained in an affidavit that existing subscribers were told that the 2002 revisions were made to three sections to clarify (1) when transactions are billable, (2) why updating the user's e-mail contact information is critical, and (3) the user's responsibility for access to and usage of the account. Am. Mitchell Decl. ¶ 7 & Ex. 3. Like the 2000 Agreement, the 2002 Agreement is titled "User License Agreement for AppraisalPort.Com" but includes the additional subtitle "Revised: August 14, 2002." *Id.* Ex. 4.

10. Clause 12 of the 2002 Agreement is identical to the arbitration agreement in the 2000 Agreement except the fee-shifting arrangement in the second paragraph differs as follows:

agreement also contains modification and choice-of-law provisions identical to those contained in the 2000 agreement. *See* Am. Mitchell Decl. ¶ 11 & Ex. 5. Based on their date of enrollment, it appears to be undisputed that Harold Huggins, of Huggins Realty, and Jan Martin, of P.E. Turner, initially agreed to this 2002 Agreement.[11]

It also appears undisputed, at least for purposes of this motion, that Schneider and Turner, as existing subscribers, became subject to the 2002 Agreement through amendment of their prior agreement. According to FNC, the first time existing subscribers like Schneider and Turner logged on to AppraisalPort after August 14, 2002, a "pop-up" box appeared on the computer screen, informing them that the User License Agreement "has been updated," summarizing and highlighting the changes to the agreement, and prompting the user to view the revised agreement and acknowledge agreement to the terms. Specifically, the existing subscriber encountering this pop-up box had a choice to either "View Now" or "View Later" the revised agreement. Clicking "View Now" caused the new 2002 Agree-

ment to appear and the user was given the choice to click either "I agree" or "I disagree." If a user clicked "I agree," a "Thank You" message appeared and the user could proceed to use his or her account and would be spared further pop-up interruptions at the start of future sessions. Those users who clicked either "View Later" or "I disagree," on the other hand, could proceed with the current session but would encounter the same inquiries at the start of each subsequent session until the subscriber clicked "I agree." It is noteworthy that, despite creating this labyrinth for both its users and itself, FNC concedes that it does not have any records regarding which buttons were clicked by existing subscribers logging on after August 14, 2002, and when or if the users assented to the 2002 Agreement. Am. Mitchell Decl. ¶ 7.

On July 12, 2005, FNC again revised its user agreement offered to new subscribers, this time offering a "Subscription Agreement" ("2005 Agreement"). This 2005 Agreement contains no clause addressing arbitration.[12] It is undisputed

---

All costs and legal fees of FNC, Inc. in any way associated with an arbitration or judicial action arising out of or relating to this agreement, whether such action is between FNC, Inc. and yourself or a third party to whom you have supplied information derived from PORT, shall be paid by you if the basis of the dispute includes, and it is ultimately determined that you or the information you supplied were a contributing cause to the loss or damage resulting. If a determination is made that FNC and you were both contributing causes to the loss or damages resulting, the arbiter shall determine what percentage of the losses or damages were the result of your actions, and in such case, you shall pay this percentage of FNC's costs and legal fees associated with the action.

Am. Mitchell Decl. Ex. 4. It is noteworthy that, while FNC apparently highlighted three specific modifications to the 2000 Agreement

concerning when transactions are billable, updating the user's e-mail information, and the user's responsibility for accessing and using the account, *see* note 10, *supra*, this change concerning the shifting of costs and legal fees was not highlighted for the existing subscriber.

**11.** According to FNC's records, Huggins registered on June 25, 2003, while Martin did so on March 4, 2004. *See* Am. Mitchell Decl. ¶¶ 3, 8 & 10.

**12.** The Court notes also that the 2005 Agreement is not simply the 2002 Agreement minus the arbitration provision or even the same agreement with certain other revisions. Although neither the parties nor the Court have attempted to analyze the materiality of the other differences, it is clear from its appearance that the 2005 Agreement represents a completely redrafted user agreement that may

that Plaintiff Torres, based on his enrollment in November 2006, agreed to the 2005 Agreement at the time of registration and, therefore, is not subject to binding arbitration. As such, it is also undisputed that the Arbitration Plaintiffs would not be subject to binding arbitration *if* the 2005 Agreement effectively superseded the prior agreements between each of them and FNC.

FNC concedes that it "attempted" to amend and replace the 2002 Agreement with the 2005 Agreement but contends that this attempt was "unsuccessful." Unlike the period following the introduction of the 2002 Agreement, however, persons who were already subscribers of AppraisalPort prior to the introduction of the 2005 Agreement apparently were not required to acknowledge the change in user agreements through a pop-up screen or any other method. Instead, if an appraiser who subscribed before July 12, 2005, logged on between July 13, 2005, and August 5, 2005, a banner would have appeared at the top of the webpage "noting that new terms of service were being put into effect," Am. Mitchell Decl. ¶ 12, although the precise wording of this notice is not provided. An existing subscriber who did not log on to the website during this period could not have seen the banner.

Moreover, following the introduction of the 2005 Agreement, and even after Plaintiffs filed their Amended Complaint in this case and FNC filed two motions to compel arbitration, AppraisalPort displayed the 2005 Agreement as the "User Agreement" on a webpage accessible by all subscribers after logging in to their password-protected accounts. This included appraisers such as the Arbitration Plaintiffs who had

first signed on and agreed to terms of use prior to the 2005 Agreement and were notified by a pop-up window of the change in terms in 2002. *See* Decl. of Perry E. Turner, Jr. ¶¶ 1–3 & Ex. B & F; Schneider Decl. ¶¶ 1–3 & Ex. C & E; Decl. of Harold H. Huggins ¶¶ 2 & Ex. C. This 2005 Agreement was posted as the applicable user agreement for the Arbitration Plaintiffs as late as November 2007, more than six months after Plaintiffs filed their Original Complaint.

The language of the 2005 Agreement is also relevant to the issue of amendment, given its display on the FNC website as the "user agreement" for all users. Specifically, the 2005 Agreement states: (1) "This Subscription Agreement ... shall govern SUBSCRIBER's use of AppraisalPort's products and services. Subscriber must agree to abide by all of the terms and conditions in order to become or to remain an authorized SUBSCRIBER," Schneider Decl. Ex. B sec. 1, para. 5; (2) "SUBSCRIBER's ... use of any product or service constitutes SUBSCRIBER's agreement to its terms and conditions in their entirety," *id.* para. 6; and (3) "This Agreement constitutes the entire understanding and agreement between AppraisalPort and SUBSCRIBER with respect to the transactions contemplated herein and supersedes any and all prior ... oral or written communications with respect to the subject matter hereof, all of which are merged herein," *id.* sec. 10, para. 2.

Finally, it is also relevant that all three agreements contain choice-of-law provisions designating the law of Mississippi as the law to be applied to disputes arising under the agreements.[13]

---

or may not contain numerous other material differences aside from the absence of any arbitration provision. *See* Decl. of Carl S. Schneider Ex. B.

13. Both the 2000 and 2002 Agreements state that the agreements "shall be governed by the laws of the State of Mississippi as such laws are applied to agreements entered into and to

## II.

■ The FAA provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The United States Supreme Court has recognized that Congress enacted the FAA to "reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson, Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Thus, the FAA embodies a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Dockser v. Schwartzberg,* 433 F.3d 421, 423 (4th Cir.2006). In considering a motion to compel arbitration pursuant to section 3 of the FAA, the Court must determine "[1] that a valid agreement to arbitrate exists between the parties and [2] that the specific dispute falls within the substantive scope of that agreement." *Glass v. Kidder Peabody & Co., Inc.,* 114 F.3d 446, 453 (4th Cir.1997)(quoting *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir. 1990)). As mentioned above, the Court finds that there is no valid agreement to arbitrate between FNC and any of the Plaintiffs, thereby obviating the need to decide whether the dispute raised by Plaintiffs falls within the scope of such an agreement.

### A. Applicable Law

■ Although federal law demands that the scope of arbitration clauses be interpreted liberally, the antecedent inquiry—whether there is a valid agreement to arbitrate—is a question of state law governing the formation of contracts. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Adkins v. Labor Ready, Inc.,* 303 F.3d 496 (4th Cir.2002). In this manner, "even though arbitration has a favored place under federal law, there still must be an underlying agreement between the parties to arbitrate." *Arrants v. Buck,* 130 F.3d 636, 640 (4th Cir.1997). Therefore, before exploring whether a valid agreement to arbitrate exists, the Court must first determine which state law governs.

In this case, it is undisputed, at least for purposes of this motion, that all Plaintiffs except for Torres were at some point in time subject to the 2002 Agreement. In order to decide whether a valid arbitration agreement exists between the Arbitration Plaintiffs and FNC, the Court must determine whether the 2005 Agreement superseded the 2002 Agreement. As reviewed above, parties to the 2002 Agreement explicitly agreed (1) to the conditions under which FNC could modify its terms and (2) that the law of Mississippi would govern any interpretation of the agreements. With no question that the terms of the 2002 Agreement govern its modification and specify that such terms be governed by the law of Mississippi,[14] the Court will apply Mississippi law in determining whether the 2005 Agreement superseded all prior agreements to which the Arbitra-

---

be performed entirely within Mississippi." *See* Am. Mitchell Decl. Ex. 2 ¶ 12 & Ex. 5 ¶ 13. The 2005 Agreement states it "shall be construed and enforced in accordance with the internal laws of the State of Mississippi applicable to contracts wholly executed and wholly to be performed therein." *See id.* Ex. § 10 ¶ 7.

14. FNC acknowledges in a footnote in its Reply Memorandum that all three relevant agreements designate that Mississippi law shall govern the interpretation as them. *See* FNC Reply Mem. at 6 n. 6.

tion Plaintiffs were parties. *See Volvo Constr. Equip. N. Am., Inc. v. CLM Equipment Co.,* 386 F.3d 581, 595–99 (4th Cir.2004)(applying the law of jurisdictions designated in choice-of-law clauses (1) to interpret the meaning of termination clauses, including questions of integration, the effect of subsequent oral promises, course of dealing, and duty of good faith and fair dealing, as well as (2) to determine whether defendant was estopped from terminating).

## B. Whether a Valid Agreement to Arbitrate Exists

FNC argues that valid agreements to arbitrate exist between each of the Arbitration Plaintiffs, on the one hand, and itself, on the other, because all such Plaintiffs agreed to the terms of the 2002 Agreement at some point, including its clause providing for binding arbitration, and that such agreements are still in effect. FNC admits that, on July 12, 2005, it at least "attempted" to amend the 2002 Agreement by replacing it with the 2005 Agreement, which does not include an arbitration provision. FNC argues, however, that the 2005 attempted amendment was not effective for users who had already subscribed prior to its introduction for two reasons: (1) FNC did not ever ask these existing subscribers to "acknowledge" their acceptance of the changes, as allegedly "required" by the terms of the 2000 and 2002 Agreements; and (2) FNC did not otherwise provide sufficient notice to subscribers who had enrolled prior to July 12, 2005, as required under general contract law.

Plaintiffs raise two main arguments as to why the Arbitration Plaintiffs are not bound by the arbitration provision of the 2002 Agreement. First, Plaintiffs contend that the 2005 Agreement superseded the 2002 Agreement. Specifically, Plaintiffs highlight that both the 2000 and 2002

Agreements state that they could be modified at any time by FNC as long as the new terms were posted on the website for 30 days, a condition that Plaintiffs argue was satisfied here. That this was all that was needed to effect a modification is supported, Plaintiffs claim, by the fact that FNC does not maintain records as to which users acknowledged past notifications of new terms. This supersession is supported also, Plaintiffs claim, by the terms of the 2005 Agreement itself, which purport to govern the terms of use for all users.

Second, Plaintiffs urge that FNC should be precluded by the doctrines of estoppel and waiver from arguing that the 2005 Agreement does not apply. For support of its equitable arguments, Plaintiffs cite the facts that (1) the 2005 Agreement was posted on its website following its introduction as *the* "User Agreement" for all users accessing the site, including those who had not explicitly acknowledged it by clicking through a pop-up and window and (2) FNC included a banner notifying users of the new terms from July 13, 2005, to August 5, 2005.

In order to resolve these issues, the Court will address: (1) whether FNC complied with the modification provisions of the 2002 Agreement when it introduced the 2005 Agreement, posted it on its website as the "User Agreement" for all accounts, and posted a banner for several weeks indicating that the terms and conditions of use had been changed; (2) assuming that FNC did not comply fully with the modification terms of the 2002 Agreement, whether FNC nevertheless effected a valid modification under the terms of the 2002 Agreement because the Arbitration Plaintiffs have waived one or more such requirements; and (3) whether FNC waived or is estopped from asserting its right to enforce the arbitration provisions con-

tained in the 2000 and 2002 Agreements through its actions taken in relation to the introduction of the 2005 Agreement.

### (1) Whether the Prior Agreements Were Validly Superseded by the 2005 Agreement

■ FNC argues that any modification to the prior user agreements was ineffective because it neither (1) complied with specific provisions in the prior agreement governing such modifications nor (2) complied with general principles of law governing the formation of contracts, including notice to the existing users. In considering these arguments, the Court should first clarify that, while parties may agree in advance to a method for modifying an agreement, such method is not exclusive, and the parties are free to choose another method of modification, thereby waiving the originally agreed provisions for modification. *See* 17A C.J.S. Contracts § 409. As explained herein, the Court concludes that FNC's modification through issuance of the 2005 Agreement either complied with the explicit provisions of the 2000 and 2002 Agreements, or, alternatively, such provisions were otherwise waived by the Arbitration Plaintiffs.[15]

### (a) Compliance with Modification Provisions

■ Both the 2000 and 2002 Agreements contain the following provision permitting FNC to modify the agreements unilaterally under certain conditions:

This User Agreement *may be modified at any time.* Whenever changes are made, the revised agreement *will be posted at this location.* New terms *will be effective 30 days after the changes are posted.* You *will be asked to acknowledge* your acceptance of the changes the first time you log in after the changes have been made.[16]

(Emphasis added.) Under the plain terms of the first sentence, therefore, the 2000 and 2002 Agreements purport to give FNC the unilateral right to modify them at any time. FNC argues that the second, third, and fourth sentences in the modification paragraph create mandatory conditions that must be satisfied before a modification is valid. As discussed above, it is undisputed that FNC did not ask previously registered users to acknowledge the 2005 Agreement the first time they logged in after it was introduced or, for that matter, at any time they logged in. For this reason, FNC contends, its attempted modification was ineffective.

The Court disagrees for two reasons. First, the modification provisions of the 2000 and 2002 Agreements are, at the very least, ambiguous as to whether asking the user to "acknowledge" acceptance of the changes is truly a necessary condition to effect a modification. In a case cited by FNC, the Supreme Court of Mississippi ruled that "[a]mbiguities in a contract are to be construed against the party who drafted the contract." *Union Planters Bank, Nat'l Ass'n v. Rogers,* 912 So.2d 116, 120 (Miss.2005)(citing *Miss. Transp.*

---

**15.** The Court declines to reach the issue of whether FNC's "attempted" modification here complied with general principles governing contract formation. Such a decision is unnecessary given the Court's conclusion—discussed in greater detail herein—that, even if FNC's actions did not comply with general contract principles concerning formation and amendment of contracts, FNC is nevertheless estopped from denying the validity of the

2005 Agreement or, alternatively, has waived its right to assert any arbitration provision.

**16.** This provision in the 2000 Agreement ended by stating, "This version of the User Agreement was modified on January 12, 2000," while the 2002 Agreement contained a similar statement but giving the date as August 14, 2002.

*Comm'n v. Ronald Adams Contractor, Inc.,* 753 So.2d 1077, 1084 (Miss.2000)). FNC cites *Rogers,* of course, because the Supreme Court there found that a bank customer's continued use of an account by itself was insufficient to effect a modification, at least where a prior mailing had stated that the customer's agreement would be effected by "signing a signature card *and* using your account." 912 So.2d at 118–19. Critical to the result in *Rogers,* however, was the fact that it was the drafter of the modification provisions who sought to validate its own attempted modification, not invalidate it, as FNC seeks to do here. In stating the above-quoted passage as one of the bases of its decision, therefore, *Rogers* stands less for the strict construction of modification provisions *in general,* than it does for the strict construction of them *against the drafter.*[17] (More on *Rogers, infra.*)

Turning to the facts of this case, the Court recognizes that all three sentences in the modification provision in the 2000 and 2002 Agreements include the phrase "will be." Only one of those sentences, however, includes the *effectiveness* of the modification as being linked to the "will be" language. Specifically, while the second sentence states that the new terms "will be *posted,*" and the fourth sentence states that the user "will be *asked to acknowledge,*" only the third sentence purports to state explicitly the condition(s) under which the new, unilaterally imposed terms "will be *effective.*" By using the phrase "will be effective" in this manner, the third sentence creates an ambiguity because it is at least capable of being understood as stating that posting of the new terms for thirty days is not merely one in a series of necessary conditions but is, in fact, sufficient by itself to effect a modification.[18] The implication of such a reading, of course, is that asking the user for acknowledgment is not necessary to effect a modification, but is rather mere

---

**17.** So, too, in *DIRECTV v. Mattingly,* 376 Md. 302, 829 A.2d 626, 639 (2003), also cited by FNC, the Court of Appeals of Maryland explicitly relied on the fact that the party seeking to militate a purported modification requirement was its drafter and initiator of the modification in question. In *Mattingly,* a subscriber accepted satellite television service subject to a written customer agreement, which included a provision permitting DIRECTV to change the terms and conditions. Subsequently, DIRECTV mailed another agreement to the subscriber that appeared to be nearly identical to the prior agreement but importantly contained certain changes that were neither highlighted nor separately described, including the addition of a new provision purporting to subject all disputes under the agreement to binding arbitration. *Id.* at 629. *Mattingly* held that simply sending the revised agreement did not satisfy the plain meaning of the prior agreement's requirement of "notice describing the change" because it did not "let [the subscriber] know ... *what that change entailed.*" *Id.* at 634 (emphasis in original). Like the Mississippi Supreme Court in *Rogers,* however, *Mattingly*

also made clear that its holding depended on the fact that a party with power to unilaterally modify an agreement should be strictly held to the modification terms it sets forth:

> [W]here a party voluntarily included a notice of changes provision in a *customer* agreement *it authored* and had unilateral authority to amend, a holding by this Court that respondent impliedly agreed to changes and new terms within an agreement regardless of whether petitioner complied with the notice provision it authored, would be the practical equivalent of writing the notice provision out of the customer agreement.

*Id.* at 636–37 (emphasis added).

**18.** The Court need not consider whether the posting of the new terms for thirty days, while sufficient, is actually *necessary* to effect modification under the terms of the 2000 and 2002 Agreements. To explain this hesitation, it suffices to say that parties might provide for alternative methods of modification, under each of which a modification will be effective but only one of which is necessary.

"icing on the cake."[19]

The Court recognizes that FNC stated in the fourth sentence that it would "ask" prior users to acknowledge their acceptance of the changes the first time they log in after the new terms are posted. The question is: what are the consequences if it fails to do so? Nothing in the fourth sentence or in any other term explicitly indicates that asking for customer acknowledgment is a condition precedent to the *effectiveness* of FNC's unilateral modifications.[20] The fourth sentence simply does *not* state that the revisions "will be effective" after they have been posted for thirty days *and* after users are asked to acknowledge their acceptance.[21] And while such a requirement, as drafted, is capable of being read as a condition precedent to the effectiveness of a modification, such a reading is not clear in light of the explicit provision just before it that effectiveness "will" occur after the new terms are posted for thirty days. In sum, where it is ambiguous whether such an acknowledgment inquiry is a condition precedent to the effectiveness of a modification, and where FNC's legal position would benefit from its admitted failure to do so, the Court construes the language against FNC and concludes that the 2000 and 2002 Agreements permit modification by FNC at any time and that such modifications will be effective after they are posted for thirty days.[22]

(b) *The Appraisal Plaintiffs' Waiver of Modification Requirements*

■■■ The second reason that FNC's failure to ask users for acknowledgment is not an impediment to a valid modification is that Plaintiffs have, in any event, explicitly waived the acknowledgment requirement by their pleadings in this case. In other words, even assuming that FNC was required to ask users for their acknowledgment of the 2005 Agreement, FNC loses sight of the fact that "a contract's method of modification is not an exclusive method, because the parties can waive that method, or any other right under a contract." *Cousineau v. Norstan, Inc.*, 322 F.3d 493, 497 (8th Cir.2003)(citing 10 Williston on Contracts § 29:42 (4th ed. 1999); 17A C.J.S. Contracts § 409 (1999)). "Parties to a contract may waive contractual rights and/or provisions intended for their benefit." *Shared Imaging, Inc. v. Campbell Clinic, Inc.*, 994 F.Supp. 919, 924 (W.D.Tenn.1998); *Batterman v. Consumers Ill. Water Co.*, 261 Ill.App.3d 319, 199 Ill.Dec. 881, 634 N.E.2d 1235, 1236 (1994).

On the question of waiver, *Rogers* is again relevant and again unhelpful to FNC's argument. In addition to construing modification provisions against the drafter, as reviewed above, *Rogers* also

---

**19.** The second sentence in the modification paragraph—requiring that FNC post the revised agreement whenever changes are made—is merely an auxiliary requirement to the overall condition for modification stated in the third sentence that a thirty-day period pass after the new terms are posted.

**20.** Moreover, while the fourth sentence purports to require FNC to *ask* for the user's acknowledgment of acceptance, it is relevant that no mention is made as to whether the user must *actually* acknowledge such acceptance before the new terms "will be effective."

**21.** To put it another way, as argued by Plaintiffs, the 2002 Agreement does not state that "the changes will take effect only if you accept them" or even that "the changes will take effect only if FNC asks for your acknowledgment."

**22.** This conclusion does not render the requirement of asking for acknowledgment a nullity. Failure to fulfill a requirement may still constitute a breach of the contract that is otherwise remediable.

carefully limited its holding to cases in which one party unilaterally attempts to *divest* another party of its important right of access to the courts by *adding* an arbitration clause. In finding "absolutely no evidence that either of the Rogerses voluntarily and knowingly waived their right to access to the courts," 912 So.2d at 119, the court explained the need for a strict waiver requirement in this special context: "waiving the right to have access to the courts is something much more significant and of a different character than changing the terms and conditions of a bank account, assent for which can be obtained simply by the continued use of the account." *Id.* at 120. Such a strict waiver requirement is not called for here, where the Arbitration Plaintiffs have not have waived their right to have access to the courts and, in fact, seek to gain such access through waiver of a contractual provision arguably intended for their protection. As such, the Court finds that the Arbitration Plaintiffs can and did waive any provision stating that FNC will ask for their acknowledgment of the 2005 Agreement, to the extent that such an inquiry may have been required.

### (2) Estoppel and Waiver as to FNC

Plaintiffs argue that, even assuming that the 2005 Agreement did not actually supersede the 2002 Agreement with its arbitration provision,[23] FNC is nevertheless precluded by principles of estoppel and waiver from asserting the arbitration provision due to its subsequent conduct. The Supreme Court of Mississippi has summarized that "[w]aiver is voluntary surrender or relinquishment of some known right, benefit or advantage; estoppel is the inhi-

bition to assert it." *Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So.2d 954, 964 (Miss.1999). Although Plaintiffs do not neatly separate the distinct concepts of estoppel and waiver, the Court interprets Plaintiffs's arguments as twofold: (1) FNC is estopped from denying that the 2005 Agreement superseded the prior agreements and (2) FNC has waived the arbitration provision contained in the prior agreements through its conduct, including through its representations as to the effectiveness of the 2005 Agreement on its website after the commencement of this litigation. Each of these arguments is discussed separately.

### (a) Estoppel to Deny Effectiveness of Modification by 2005 Agreement

■ Plaintiffs argue that FNC should be precluded from making an argument to this Court that is belied by its own conduct and representations to the opposing litigants. As already reviewed, the conduct and representations Plaintiffs highlight are FNC's display of a banner on the AppraisalPort site for a twenty-four day period following the introduction of the 2005 Agreement indicating that changes to the user agreement had been adopted and the display of the 2005 Agreement itself under a link entitled "User Agreement" on each user's password-protected portion of the site. Such displays, the argument goes, represented to the user that the 2005 Agreement was, in fact, the applicable user agreement for any user that happened to log on at the time the banner was displayed or bothered to check his or her user agreement and compare it to his or her prior agreement.[24] Such a representa-

---

23. As already mentioned, the Court has declined to reach FNC's argument that the "attempted" modification was invalid because it did not comply with general principle of contract law.

24. The Court, of course, recognizes that, without notice that changes have occurred, a user who merely views the 2005 Agreement, may have no actual notice that changes have been made. As the Ninth Circuit observed with respect to a similar situation: "Without no-

tion, according to Plaintiffs, is inconsistent with FNC's position in this litigation that the 2005 Agreement does not apply to the Arbitration Plaintiffs. Plaintiffs further claim in their argument that they and their lawyers have relied on these representations concerning the governing agreement in bringing and maintaining this suit.

 "Equitable estoppel is a doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right he otherwise would have." *In re Municipal Boundaries of City of Southaven*, 864 So.2d 912, 917 (Miss.2003). Under Mississippi law, a party asserting equitable estoppel must prove (1) belief and reliance on some representation; (2) change of position as a result of the representation; and (3) detriment or prejudice caused by the change in position. *Id.*; *see also Brock v. Hankins Lumber Co.*, 786 So.2d 1064, 1067 (Miss.App.2000)(defining equitable estoppel as applying where "one party by its conduct, words, or even silence, makes a representation or concealment of material facts ... with actual or imputed knowledge of the facts and with the intent that the other party rely on the representation because of the party's ignorance of the truth," proximately causing injury to the other party).

A leading treatise has explained that ordinary principles of estoppel may be applied to the formation of contracts, and not only their interpretation: "if either party misrepresents an element of fact essential to the existence or nonexistence of a contract, and the other party justifiably relies on this representation and takes detrimental action in consequence, it will not be open to the party making the representation to show its error." [25] 2 Williston on Contracts § 6:63 (4th ed. 2000); *see, e.g., Netco, Inc. v. Dunn*, 194 S.W.3d 353, 360 (Mo.2006)(explaining that "[a] party may be estopped from questioning the existence, validity and effect of a contract by accepting the benefits of that contract"); *Otero v. Wheeler*, 102 N.M. 770, 701 P.2d 369, 373 (1985)(observing that "[o]ne may not partially perform when advantageous to do so, nor reap the benefits from written or unwritten contracts, and then assert absence of contract to avoid the penalties of refusing to complete performance"); *Alix v. Alix*, 497 A.2d 18 (R.I.1985)(asserting that "when a necessary element of a contract is lacking as a result of one contracting party's failure to act, and that party has reaped those benefits to which he or she was entitled under the contract, he or she cannot thereafter raise the issue of the validity of the contract in order to avoid fulfilling his or her own obligations under the contract"). As such, the Court may consider whether FNC is estopped from denying that the Arbitration Plaintiffs assented to the 2005 Agreement and, therefore, that the modification was effected.

FNC is correct that, at least under the doctrine of equitable estoppel, Plaintiffs cannot prevail. As reviewed, a party seek-

tice, an examination would be fairly cumbersome, as [the user] would have had to compare every word of the posted contract with his existing contract in order to detect whether it had changed." *Douglas v. United States Dist. Court for the Centr. Dist. of Cal.*, 495 F.3d 1062, 1066 n. 1 (9th Cir.2007).

**25.** The classic example given is when an acceptor of an offer inaccurately dates an accep-

tance beyond the last date on which such acceptance may be made and the offeror changes its position in reliance upon the date shown on the acceptance. In such a case, the acceptor would be estopped from showing that the acceptance was actually made within the time prescribed. 2 Williston on Contracts § 6:63 (4th ed. 2000)(citing Restatement (Second) of Contracts § 41 cmt. a).

ing to utilize equitable estoppel must show that it has relied on the representation at issue in changing its position, causing a detriment. Although Plaintiffs argue that they and their lawyers relied on FNC's representations that the 2005 Agreement governs the Arbitration Plaintiffs' ability to bring this suit, this assertion is not supported by any evidence on the record and, in fact, is undermined by it. Schneider and Turner both submitted sworn affidavits indicating that they each accessed the AppraisalPort website and checked the posted user agreement in July 2007, at which time they discovered that the 2005 Agreement was listed. This was after FNC filed its first motion to compel arbitration revealing its argument that the 2005 Agreement was ineffective and approximately two months after Plaintiffs filed their Complaint. As such, the only evidence indicates that certain employees of Plaintiffs learned that the 2005 Agreement was posted on the website after suit was filed; there is no evidence that they knew of the posting before the suit was filed or that it relied on such knowledge in filing the Complaint.

 This, however, does not end the inquiry. In addition to equitable estoppel, Mississippi recognizes the doctrine of "quasi estoppel." The Supreme Court of Mississippi has explained that the doctrine of quasi-estoppel " 'precludes a party from asserting to another's disadvantage, a

right inconsistent with a position [it has] previously taken,' and 'applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.' " [26] *Bailey v. Estate of Kemp,* 955 So.2d, 777, 782 (Miss.2007)(quoting *Bott v. J.F. Shea Co.,* 299 F.3d 508, 512 (5th Cir.2002)(describing Texas law)); *see also Wood Naval Stores Export Ass'n v. Gulf Naval Stores Co.,* 220 Miss. 652, 71 So.2d 425, 430 (1954). The concept of quasi estoppel, although a species of equitable estoppel, is based on the principles of election, waiver, ratification, affirmance, acquiescence, or acceptance of benefits. 31 C.J.S. Estoppel & Waiver § 146. Unlike equitable estoppel, however, quasi estoppel does not require detrimental reliance.[27] *Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 371 (5th Cir.1990)(explaining that "[q]uasi estoppel differs from equitable estoppel or estoppel in pais in that quasi-estoppel requires no concealment or misrepresentation of existing facts on the one side, and no ignorance or reliance on the other" (internal quotation marks omitted)).

The Court finds that FNC is estopped from denying the validity of the 2005 Agreement as a modification to prior agreements with existing subscribers at the time it was introduced because such a position would be inconsistent with its prior representations, and permitting it to

**26.** Another court has formulated the doctrine in terms of the following elements: "(1) the offending party took a different position than his or her original position and (2) either (a) the offending party gained an advantage or caused a disadvantage to the other party; (b) the other party was induced to change positions; or (c) it would be unconscionable to permit the offending party to maintain an inconsistent position from one he or she has already derived a benefit or acquiesced in." *Atwood v. Smith,* 138 P.3d 310, 314 (Idaho 2006).

**27.** Although Plaintiffs do not name the doctrine of quasi estoppel, their equitable arguments concerning FNC's actions discuss principles that are certainly akin to it, and FNC has had an opportunity to rebut such arguments and all relevant facts thereto. *Cf. Lozano v. Ocwen Fed. Bank, FSB,* 489 F.3d 636, 640 (5th Cir.2007)(finding that the defendant did not waive the argument of quasi estoppel on appeal where it had pleaded "estoppel" generally in the lower court).

assert such a position would be unconscionable. *See Unruh v. Indus. Comm'n of Arizona,* 81 Ariz. 118, 301 P.2d 1029, 1031 (1956)(explaining that quasi estoppel applies where "the conscience of the court is repelled by the assertion of rights inconsistent with a litigant's past conduct"). Such a denial now in this litigation is wholly inconsistent with FNC's representations to its users since the introduction of the 2005 Agreement—and continuing well into this litigation—that it was the applicable user agreement for all users. FNC itself admits that it attempted to modify the prior agreements by replacing them with the 2005 agreement but claims that it was "unsuccessful." Yet, there is no indication before the Court that FNC ever realized that its attempted modification "failed" until it sought to compel arbitration in this proceeding. It never posted an announcement or created a pop-up window informing its subscribers of this failure and clarifying that the 2002 Agreement still applied, nor did it ever seek to correct the failure through notifying its subscribers that continued use would result in the application of the 2005 Agreement to them.[28] Rather, just as FNC claims that the Arbitration Plaintiffs cannot claim knowledge of the posting of the 2005 Agreement prior to filing the case, FNC cannot claim knowledge that such a posting was in error prior to filing its motion to compel. *See Betz v. F.D.I.C.,* 99 F.3d 904, 906 (9th Cir.1996)("[W]hen a party's treatment of an account is inconsistent with the party's litigation position before the court, we are inclined to give more weight to the party's treatment of

the account than to his litigation posture.").

Strengthening the case for quasi estoppel is the doubtful ability of FNC to determine which, if any, pre-2005 subscribers (and potential class members in this case) actually did become subject to the 2005 Agreement. Although it is possible that FNC may have records of which subscribers logged on to AppraisalPort between July 13 and August 5, 2005, and thereby may have seen the banner indicating the issuance of new terms of use, it would be pure speculation to try and determine how many additional users may have clicked on the user agreement link to display the 2005 Agreement, like Schneider, Turner, and Huggins did, much less how many of them actually became aware that the agreement shown was new and superseded a prior agreement. Because FNC has conceded that it does not even have records of which users actually acknowledged the prior modification in 2002, it is at least highly doubtful that it could produce any evidence of which users even logged on during the twenty-four day banner period. FNC simply does not know who was notified and this is in part because it probably did not realize that there was any question of the 2005 Agreement's validity until it investigated the situation pursuant to this litigation. There can be no question, however, that at least some users who subscribed prior to the 2005 Agreement—even under FNC's arguments—became subject to it through their happenstance stumbling upon a temporarily posted notification banner or their curiosity in clicking on the

---

**28.** In response to Plaintiffs evidence that FNC continued to display the 2005 Agreement on the password-protected user websites within AppraisalPort even after it filed its second motion to compel arbitration, FNC states that Plaintiffs underestimate the difficulty in changing a web page to link to subscriber-

specific agreements. FNC apparently felt no obligation, however, to inform its users who might be relying on the posting of the 2005 Agreement that it may not, in fact, be the applicable agreement, or to disclaim it, or to even adopt it through proper notice.

"user agreement" link, and their continued use.

### (3) Waiver of Right to Assert Arbitration Provisions

Alternatively, the Court finds that FNC has waived its right to assert the arbitration provisions. Under Mississippi case law,

> Waiver presupposes full knowledge of a right existing, and an intentional surrender or relinquishment of that right. It contemplates something done designedly or knowingly, which modifies or changes existing rights or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right. To establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived.

*Ewing v. Adams*, 573 So.2d 1364, 1369 (Miss.1990); *see also Taranto Amusement Co. v. Mitchell Assocs., Inc.*, 820 So.2d 726, 729–30 (Miss.App.2002).

The Supreme Court of Mississippi has recognized that a party may waive an arbitration provision by conduct during the formation of a contract. *See Scott Addison Constr., Inc. v. Lauderdale County Sch. Sys.*, 789 So.2d 771 (Miss.2001). In *Addison*, the plaintiff construction company filed a demand for arbitration against a school system under a contract to build an elementary school. During negotiations, however, the school system had deleted the arbitration provision. Mississippi's Supreme Court upheld the trial court's finding that the plaintiff waived any objection to the deletion of the arbitration provision by raising other objections to the contract but remaining silent on the deleted arbitration clause and proceeding to perform the contract by building the elementary school. *Id.* at 775.

Here, the indications of waiver are even stronger than in *Addison*. FNC admits that it intended to modify the 2002 Agreement through its issuance of the 2005 Agreement but claims that it failed to do so only because it did not notify users like the Arbitration Plaintiffs here. In doing so, it affirmatively placed a banner on its website notifying users of the new agreement and posted the new agreement as the effective user agreement for all subscribers. As the drafter, FNC can certainly be charged with knowledge of the terms of both the 2002 and 2005 Agreements and, therefore, must be assumed to have known that it was issuing an agreement that removed its right to compel arbitration. Such a relinquishment was certainly voluntary, as FNC was the only party with power to modify the agreement. Accordingly, the Court finds that FNC has waived any right to compel arbitration under the 2000 or 2002 Agreements.

### III.

In the end, it is important to keep in mind that FNC drafted the user agreements for AppraisalPort with its own pen (or keyboard, more likely) so as to give it, and it alone, the power to modify its terms. Although one might normally consider this a blessing, it can also be a curse. While FNC was free to lay down the rules to govern its relationship with its users, it also took the risk that in doing so it would live to regret such rules when future circumstances proved them disadvantageous. The voluntary and knowing removal of the binding arbitration clause in the 2005 Agreement is one such modification—or attempted modification—that FNC clearly grew to regret, but only after the filing of this case. Until this case, all actions by FNC indicated that it had wanted to effect the modification and believed it had done so successfully.

But what if FNC did not regret the 2005 Agreement and, because of some legal advantage it gave, instead sought to enforce it? Surely the Court would be hearing argument from FNC that the Arbitration Plaintiffs freely assented to the provisions giving FNC full power to modify their agreements unilaterally after posting them and that FNC complied with its obligations. Again, the Court would be forced to parse ambiguous modification provisions, and again the Court would likely need to consider the equities inherent in the conduct of the parties. In this manner, FNC's actions are like a man standing with one foot on a dock and one foot on an untethered boat drifting away and unable to choose whether to stay on land or shove off to the sea. When this case was filed, FNC's time to choose ran out and it ended up in the water. As FNC's predicament is wholly of its own making, the Court will not now throw it a life preserver.

Accordingly, for the reasons stated above, the Court will enter an order denying the motion to compel.

## ORDER

Upon consideration of the Motion of FNC, Inc. to Stay Proceedings in Favor of Arbitration [Paper No. 21], the response and reply thereto, and the arguments of counsel presented at the hearing conducted before the undersigned on December 10, 2007, for the reasons stated in the accompanying memorandum opinion, it is this 28th day of August, 2008, by the United States District Court for the District of Maryland,

**ORDERED**, that the Motion of FNC, Inc. to Stay Proceedings in Favor of Arbitration [Paper No. 21] is **DENIED**.